**Billy Ray HUDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 40525.**

Court of Criminal Appeals of Texas.

July 26, 1967.

C. C. Divine, Houston, for appellant.

Carol S. Vance, Dist. Atty., Phyllis Bell, Asst. Dist. Atty., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

OPINION

WOODLEY, Presiding Judge.

The offense is murder; the punishment, 99 years and one day.

The indictment alleged that Jimmie Charles Hatchett and appellant killed Jeff Anderson Colvin, Jr. on or about the 7th day of February while engaged in the perpetration of and the attempt at the perpetration of the crime of robbery. Severance was granted, and appellant was tried first. His co-defendant testified as a witness in his behalf.

Appellant's principal ground of error is that the evidence is insufficient to sustain the conviction.

This ground for reversal must be considered and viewed in the light of the following applicable rules of law.

The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. The jury may believe a witness though he has been contradicted, Navar v. State, Tex.Civ. App., 344 S.W.2d 188, and may accept a part of his testimony and disregard the remainder. Gaston v. Bruton, 358 S.W.2d 207 (Court of Civil Appeals).

One intending to commit a felony and who, in the act of preparing for or in executing the same shall, through mistake or accident, do another act which, if voluntarily done, would be a felony, shall receive

the punishment affixed to the felony actually committed. Art. 42, P.C.; Smith v. State, 154 Tex.Cr.R. 234, 225 S.W.2d 846.

■ The general verdict finding the defendant guilty of murder with malice will be applied to the acts finding support in the evidence. Johnson v. State, 169 Tex. Cr.R. 612, 336 S.W.2d 175, cert. denied, 364 U.S. 927, 81 S.Ct. 355, 5 L.Ed.2d 267.

The court's charge, to which there were no objections, authorized conviction upon a finding by the jury that appellant made an assault upon the deceased and by said assault and violence attempted to rob him.

The court also charged on the law of principals, and submitted murder without malice, aggravated assault and simple assault, as well as the defense raised by the testimony of co-indictee Hatchett to the effect that the deceased had taken or was taking property from him (Hatchett) without his consent and he caused the fatal injury to be inflicted in defense of his property, and the defense of accident.

Hatchett's version of the killing was that he first saw the deceased as he came out of the Calypso Lounge. The deceased asked him for a loan of a dollar and he told the deceased that he didn't have one to spare. As he started walking off, the deceased took four dollar bills out of his (Hatchett's) shirt pocket. Hatchett shoved him off and the deceased "fell up against this post and he fell off that post between two cars and when he fell he had the money in his hand and I reached down—when he fell the money fell out of his hand and I reached down and picked it up." The deceased was between two automobiles, "his head was up on the bumper and one of his legs was on the curb or sidewalk."

"Q. All right, did you—what did you do after you picked up the four one dollar bills?

"A. Well, I looked at him and walked off.

"Q. Did he appear to be hurt?

"A. No, sir.

"Q. Did you intend to hurt him?

"A. No sir.

"Q. Did you intend to kill him?

"A. No sir.

"Q. Did you know he was dead?

"A. No sir.

"Q. Where did you go then?

"A. Well, I left—me and Billy Hudson left and went to the Club Matinee.

"Q. Where was Billy Hudson during this time?

"A. Me and him had walked out together.

"Q. Where was·he when this man run his hand in your pocket and took the four one dollar bills?

"A. If I am not mistaken I think he was standing in front of the cleaners on Lyons.

"Q. Did he say anything to you?

"A. If I am not mistaken he said that man took something out of my shirt pocket.

"Q. I didn't understand you.

"A. I said if I am not mistaken he said that man took something out of your shirt pocket.

"Q. Billy said that to you?

"A. Yes sir.

"Q. You say then you and Billy went where?

"A. To the Club Matinee.

"Q. And did you get any notice or anything that the man was injured?

"A. Well, when I got to the Club Matinee I heard somebody say that

somebody got killed or hurt down there at Estes Lounge.

"Q. And did you know it was the same man?

"A. No sir, I did not."

Sherry Whitten testified that Jimmie Hatchett, the deceased Jeff Anderson Colvin, Jr., and appellant were in the Calypso Lounge at the same time on the evening in question; that the three men left the lounge separately and at different times; that shortly thereafter she (Sherry) left the lounge and walked to a spot adjacent to a cleaning establishment next door to the lounge where she heard some noise and saw the deceased, Jimmie Hatchett and appellant. She stated: "Jimmie (Hatchett) had something in his hand and it looked like he was hitting him (deceased)." She further testified that appellant was going through the pockets of the deceased. She attempted to get Jimmie Hatchett to leave the deceased alone, but he shoved her away. She stated that Theodore Searcy was standing nearby observing the affray and that "I told Theodore to call the law that they was fighting and he just stood there like he didn't hear me and I ran past Theodore and I ran up on the porch (of the lounge)." Sherry went back inside the lounge and did not again see the deceased until she left the lounge when it closed and saw him lying on the street in front of the lounge.

Theodore Searcy testified that on the night in question he was standing on the front porch of the Calypso Lounge when he saw the deceased standing near the cleaning establishment next door. Appellant was standing next to the deceased when the deceased yelled at appellant: "Please don't hit me no more." The deceased then staggered backwards, whereupon appellant hit the deceased, causing him to fall against the curb of the street. Appellant then walked away, leaving the deceased lying in the gutter, partially on the curb, where he remained until the police and ambulance arrived.

Officer Dickerson testified that when he and another officer arrived on the scene the deceased was lying in the street at the curb and was dead.

There was also testimony that the deceased was seen carrying a carton of cigarettes in the Calypso Lounge shortly before the killing, but that the cigarettes were not found on or near his body; that when he was found his right front pants' pocket was turned inside out; that his clothing was in a state of disarray when he was found. This was in addition to the testimony that appellant had been seen going through the pockets of the deceased. All of such evidence was relevant on the issue of whether the killing occurred during a robbery or attempted robbery of the deceased.

The indictment alleged that appellant and Hatchett, with malice aforethought, voluntarily killed the deceased Colvin "by kicking and stomping him with their feet and by beating and striking him with blunt instruments and weapons the exact name or a further description of which is to the Grand Jury unknown."

The Foreman of the Grand Jury testified that the evidence before the Grand Jury indicated that it was impossible to determine the means used and the Grand Jurors were undecided as to the exact description of the weapon used.

Dr. Joseph Jachimczyk, Chief Harris County Medical Examiner, testifying from a report made from an autopsy on the body of the deceased, stated that the deceased died from a skull fracture on the back of his head and subdural hemorrhage due to blunt trauma caused by "more than three blows" inflicted upon him within two hours of his death.

There was other testimony from the witness Sherry Whitten which placed the scene of the attack upon the deceased at an earlier hour and a different location outside the Calypso Lounge. Also the witness Searcy changed his testimony and

denied that appellant participated in the assault by Hatchett upon the deceased. Searcy first testified that he was on the porch in front of the Calypso Lounge when he first saw the deceased: "He was outside. I mean he was down by the cleaners," as was appellant.

"Q. Did anything happen between those two men?

"A. Well, the man was hollering.

"Q. What man?

"A. Anderson Colvin, Jr.

"Q. What now?

"A. The guy that's dead now.

"Q. What was he hollering?

"A. He said please don't hit me no more.

"Q. Who did he say that to? Now you have got to tell the truth. Who did he say that to?

"A. Billy Hudson.

"Q. The defendant in this case, Billy Hudson?

"A. Yes sir.

"Q. What did Billy do when he said that?

"A. Well, when he said that the man just fell back—I mean staggered back over on the cleaners.

"Q. Where?

"A. Staggered back to the cleaners, just fell. The guy was mad I guess.

"Q. Just staggered back to the cleaners?

"A. Yes.

"Q. What happened after he staggered back to the cleaners?

"A. Some blows hit him again.

"Q. Who hit him some blows again?

"A. Billy Hudson.

"Q. And after he hit him those blows where did the dead man, that you refer to as the dead man, where did he go?

"A. He just staggered back and as he did he staggered back against the post and hit his head.

"Q. The telephone post?

"A. As he staggered on back he just staggered on back and hit his head.

"Q. Where did he hit his head?

"A. On the cement.

"Q. Of the street or curb or what?

"A. On the curb. As he hit he just slammed back like this.

"Q. What did this defendant do then?

"A. Walked off.

\* \* \* \* \* \*

"Q. Now, when the old man fell were there some cars parked there along the curb?

"A. Yes sir.

"Q. Is that where he stayed until the police and ambulance got there?

"A. Yes sir."

Both the state and the defense offered evidence to impeach the witness Searcy and his two prior inconsistent statements were read to the jury by appellant's counsel.

During his cross-examination, Searcy testified:

"Q. \* \* \* Did you ever see Billy Ray Hudson strike that man?

"A. No sir, I did not.

"Q. Did you see anybody strike him?

"A. Yes sir.

"Q. Who?

"A. Jimmy.

"Q. Jimmy who?

"A. Jimmy Hatchett.

"Q. Do you know Jimmy Hatchett by sight?

"A. Yes sir, I have known him a long time.

"Q. All right now, at the time that you witnessed what you witnessed or what you say, did you ever see Billy Ray Hudson do anything at all to Mr. Colvin?

"A. No.

"Q. Did you hear Billy Ray Hudson say anything at all?

"A. Yes sir.

"Q. What did you hear him say?

"A. He said freeze off the man, freeze off the old man, don't kill him.

"Q. Don't kill him or don't hit him or what?

"A. Otherwise don't kill him."

He later testified on cross-examination:

"Q. You say in your statement that the old man struck a pole. What pole was that?

"A. Well, when he was hit he fell back against the post.

\*      \*      \*      \*      \*      \*

"Q. Now, did you see Mr. Colvin strike the post?

"A. Yes sir, he fell against the post.

"Q. Now, what caused him to fall against the post?

"A. The blow from the lick.

"Q. Whose blow?

"A. Jimmy's.

\*      \*      \*      \*      \*      \*

"Q. Did you stay there or did you leave?

"A. Well, I was fixing to walk off and the police drove up.

"Q. Well now, how long had you been there before the police arrived?

"A. Well, I would say about two minutes. It was—just looked like I was in a trance, you know, me seeing a man out there like that.

\*      \*      \*      \*      \*      \*

"Q. Well, did you see Hatchett and Hudson, either one, do anything after the man fell?

"A. No sir.

"Q. Did you see Hatchett or Hudson either one take anything off of the man, Mr. Colvin, after he fell?

"A. No sir.

\*      \*      \*      \*      \*      \*

"Q. Now, how far away from the fight was Billy Hudson?

"A. Well, he was on the side of the cleaners so I say he was about five feet, I guess.

"Q. Five feet?

"A. Five feet."

There were conflicts in the testimony as to the time and exact place of the killing. These discrepancies do not render the evidence insufficient in view of testimony including that offered by the defense.

■ Viewed in the light most favorable to the state, the evidence is sufficient to sustain the jury's verdict.

We overrule appellant's further contention that the right to a fair and impartial trial was denied him.

The judgment is affirmed.

MORRISON, J., dissents.