**Jon David WEATHERRED, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–90–040 CR.**

Court of Appeals of Texas,
Beaumont.

July 8, 1992.
Rehearing Denied July 29, 1992.
Discretionary Review Refused
Oct. 21, 1992.

Daniel Hurley, Lubbock, for appellant.

Peter Speers, III, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe, for the State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the offense of Capital Murder. After finding appellant guilty, the jury answered Special Issue No. 2, "No," resulting in an automatic sentence of life in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises eight points of error in this appeal, the initial point questioning the sufficiency of the evidence to sustain the conviction.

As has been set forth time and time again by our highest criminal appellate court, in reviewing evidence sufficiency we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Matson v. State*, 819 S.W.2d 839 (Tex.Crim.App.1991). Indeed, *Jackson* went on to state:

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (emphasis theirs).

*Jackson, supra*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

■ In situations where some or all of the State's evidence is circumstantial, such evidence is not tested by a different standard of review than direct evidence, but a conviction based upon circumstantial evidence cannot be sustained if the evidence does not exclude every reasonable hypothesis other than the guilt of the defendant.[1] *Fuller v. State*, 827 S.W.2d 919 (Tex.Crim. App.1992). We find much guidance in the following language taken from *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Crim.App. 1983) *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984):

> In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State, supra*, 551 S.W.2d 364 (Tex.Cr.App.1977); *Mills v. State*, 508 S.W.2d 823 (Tex.Cr. App.1974); *Herndon v. State*, 543 S.W.2d 109 (Tex.Cr.App.1976). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Jones v. State*, 442 S.W.2d 698 (Tex.Cr.App.1969); *Taylor v. State*, 87 Tex.Cr.R. 330, 221 S.W. 611, 615 (Tex.Cr. App.1920); *Flores v. State, supra*.

In the instant case, it cannot be seriously denied that almost the entire State's case consisted of circumstantial evidence. Because appellant calls into question the sufficiency of such evidence, a somewhat detailed review of the evidence in the light most favorable to the verdict is in order.

On the morning of December 12, 1988, between the hours of 7:45 a.m. and 11:30 a.m., someone entered the residence of 7 Briarvine Court in the Woodlands, Mont-

---

1. We recognize the fact that the use of the "reasonable hypothesis analytical construct" has been abandoned. *See, Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991). However, as the *Geesa* holding is not to be retrospectively applied, appellant's sufficiency point must be decided pursuant to the analytical construct. *Id.*

gomery County, Texas, and killed William Strawn by firing a single bullet into the back of Strawn's head. December 12, 1988 was a Monday. The victim was discovered by his fiancée, Pam Beene, in whose residence the victim was killed. Pam had become worried as the victim had uncharacteristically failed to show up for work that morning and both the victim's boss and the victim's mother were unable to locate the victim as well. As the residence was the last place Pam had seen the victim, she returned there from work and discovered the victim lying face-down on the living room floor. An ambulance was summoned but Strawn was already dead.

The subsequent police investigation revealed no signs of forced entry. Several experienced police investigators testified that, in their opinion, the incident did not resemble a typical burglary as a stereo, televisions, and some valuable jewelry were not taken. The only items missing were a bonus check made out to Pam Beene, and approximately $150 in cash taken from the victim's wallet. The victim's car, a white 1988 Oldsmobile Toronado, was also missing from the garage. The fact that property was taken and that the house had been ransacked led the authorities to discount the theory of a professional contract killing.

Photographs of the crime scene indicated that each room of the house had been prowled. Someone even went so far as to dump the contents of the sugar and flour canisters into the kitchen sink and then put the canisters neatly back in their place. Appellant's fingerprints were not found on any item in the house. Latent prints that were removed were those of Pam Beene, one of Pam's children, or were of such poor quality that the prints were not identifiable.

While Ms. Beene's bonus check was never cashed nor otherwise recovered, the victim's car was located on December 16, 1988 with the keys in it on the east side of Houston in a high crime area known as "the bloody fifth ward." The car had been burned and the tires and wheels removed. On December 20, 1988, a fingerprint expert processed the victim's car but was unable to remove any fingerprints.

On the date of the incident, Pam Beene provided police with the name of Jon Weatherred, the appellant, as a possible suspect. Testimony indicates that appellant met Pam Beene in March of 1988 in Lubbock, Texas. Ms. Beene lived in Lubbock and was recently divorced. Appellant lived in Kress, Texas which is approximately 55 miles north of Lubbock. Appellant was the tennis coach at Plainview High School in Plainview, Texas which is approximately 45 miles north of Lubbock. Testimony further indicates that from March until June 1988, Ms. Beene aggressively pursued the relationship with appellant, was in love with appellant, and was quite upset that appellant did not seem interested in marrying Ms. Beene. In June 1988, however, Ms. Beene moved from Lubbock to the Woodlands after securing a teaching position at a local school.

Appellant had also been recently divorced when he met Pam Beene in March 1988. Appellant had a son from his marriage and Ms. Beene had a son and daughter from her marriage. Testimony indicates that although appellant had expressed his love for Ms. Beene, he seemed to exhibit a take-it-or-leave-it attitude towards the relationship. The relationship continued even after Ms. Beene's move to the Woodlands where appellant would visit Ms. Beene at 7 Briarvine Court on two or three occasions.

On October 21, 1988, Ms. Beene met the victim on a blind date arranged through mutual friends. The record reflects that the victim and Ms. Beene fell in love with each other the moment they met. From this point in time, the relationship between Ms. Beene and appellant was pretty much over with, as far as Ms. Beene was concerned. Not so as far as appellant was concerned. The record further reflects that appellant's reaction to Ms. Beene's attempts at ending the relationship was to become "obsessed" with recapturing Ms. Beene's love and to learn the identity of the victim. Telephone records were admitted into evidence showing that from October 19, 1988 to November 23, 1988, appellant

made 32 long distance phone calls from his home in Kress to Ms. Beene's home in the Woodlands. There was also evidence of a number of phone calls during this period of time made by appellant to the school where Ms. Beene was employed. Telephone records further indicated that the charges for "toll" calls from appellant's phone went from the previous high of $713.87 for the year 1985 to $2188.90 for the year 1988. Testimony reflects that appellant contacted both Ms. Beene's sister as well as a friend of Ms. Beene's in an effort to learn the full name of the victim. Debbie Kubiak, a friend of Ms. Beene's, characterized appellant as being out of control during one of several long conversations she had with appellant from October 31, 1988 to November 22, 1988. During one conversation with Ms. Kubiak, appellant asked her what Pam's reaction would be if the victim was "out of the picture." Ms. Kubiak replied that she (Ms. Kubiak) thought that Pam would go back to appellant. Following the disclosure of the victim's full name to appellant by Ms. Beene's sister and the fact that the victim was a purchasing agent for a medical supply business, the State introduced evidence that calls were made from appellant's phone to several medical supply companies in the Houston area. The testimony reflects that the date appellant first learned the victim's full name as well as the fact that Ms. Beene was going to marry the victim was November 23, 1988.

The record reflects that appellant was first contacted by authorities from the Montgomery County Sheriff's Office and the Texas Rangers on Wednesday, December 14, 1988. On that day, appellant was interviewed by Detectives H.B. Norris and Tracy Peterson of the sheriff's office and by Ranger Jim Mull. Appellant was described by all three investigators as being very nervous during the interview. Appellant was asked where he was on December 12, 1988. Appellant related a somewhat confusing sequence of events that apparently began on the evening of December 11, 1988 when appellant drove from Kress to Lubbock. Appellant explained that he was looking for a friend from college named Charles Sterling, although he had

not seen Sterling in three or four years. Appellant stated that he (appellant) went to various bars in Lubbock in his effort to locate Sterling. Being unsuccessful in his search for Sterling, appellant spent the night in his vehicle, a small blue pick-up truck, in Lubbock.

Appellant further stated that early on the morning of December 12, he drove back to Plainview in order to leave a lesson plan for the teacher that would be substituting for appellant at school that day. Appellant had left messages with both the principal and the principal's secretary on December 11 that appellant would not be at work on December 12. After leaving the lesson plan at the school, appellant stopped at a McDonald's drive-thru and got something to eat. Apparently on the way to or leaving from McDonald's, appellant stated that he saw, and was seen by a student named Corey Williams, and Corey's mother, Lilly Reed. This was at approximately 8:00 a.m. on December 12.

Appellant stated that from McDonald's, he returned to Lubbock in order to get an appointment with a dermatologist regarding a skin rash on appellant's face. The investigators saw no signs of a skin rash on the morning of December 14 during their interview. Appellant further stated to the investigators that he also spent much of December 12 in Lubbock trying to locate a particular toy gun for his son's birthday which, by coincidence, was on December 14. Appellant stated that he was not able to see a doctor about his skin problem nor was he able to locate the toy for his son, and ended up purchasing nothing. Appellant admitted that he knew of no one in Lubbock who could verify his presence there on December 12. Apparently prior to interviewing appellant, the investigators were made aware that appellant normally wore a mustache. Appellant had no mustache on the morning of the December 14 interview and when asked about it appellant replied that he shaved it Thanksgiving and that he shaves off the moustache as a matter of course every six to eight months. Appellant stated that he arrived back in Plainview at approximately

4:00 p.m. on December 12. At the end of this rendition of events by appellant, the investigators apparently expressed to him their doubts about the believability of the story. When the investigators inquired as to why appellant was trying to find Charles Sterling, appellant hesitated, and then related the following. Appellant stated that approximately one week prior to December 14, as appellant was leaving the Plainview High School gym, two black males approached appellant's truck, opened the driver's door, and one of the black males placed a shotgun to appellant's groin and threatened appellant. Appellant further related that one of the black males told the appellant "to stop fucking up if you ever want to see your son again." Appellant stated that he did not contact the police about the incident as one of the black males warned appellant not to. When asked to describe the two black assailants, appellant could not do so and stated that he (appellant) had never seen the two men before. When asked why the men had threatened him, appellant speculated that it may have had something to do with a student, Hope Coffin, as well as appellant's placing of students on the tennis team. Appellant related that he was trying to contact Sterling because Sterling knew some "heavies" and that the heavies might be able to help appellant. When one of the investigators asked appellant if the term "heavies" meant individuals who performed "contract services," appellant said that it did.

At the conclusion of the December 14 interview, appellant voluntarily accompanied the investigators to the Plainview Police Department so that photographs and fingerprints of appellant could be made to aid in the investigation.

A rather compelling piece of testimony occurred during the State's direct examination of Ranger Jim Mull. Mull was relating the conversation between he and appellant on the ride back from the police station to the school's administration building where the interview had taken place. The record reflects the following:

Q. (the State) On that ride back, and this being after the defendant had been fingerprinted, did the defendant ask you any questions in reference to the case at this time?

A. (Ranger Mull) Yes, sir. After we left the Plainview Police Department we had driven about two blocks down 9th Street which is going back to the school administration building, and Mr. Weatherred looked at me and said can I ask you a question. And I said yes, and he said why was my photograph and fingerprint (sic) taken at the police department?

Q. What did you tell him?

A. I told him in a lot of investigations when the crime is committed and the person that commits that crime the person leaves their fingerprint at the scene and the possibility somebody had saw (sic) him at the crime scene so that people who were suspect in the case fingerprints and photograph was taken for elimination purposes to eliminate them from being the person that was at the crime scene.

Q. Now, officer, at that point in time, you had been, as I understand your testimony, with the defendant from the time he walked in the administration building to (sic) the entire interview with Officer Peterson and Norris, the ride to Plainview Police Department and the ride—the time at the Plainview Police Department and then on the ride back to the administration building, had you ever been out of the defendant's sight?

A. No, sir.

Q. At any time during that entire time period that the previous question covered, was the defendant ever told where Bill Strawn's body was found?

A. No, sir. Not other than in Montgomery County.

Q. Where—at that point in time, where did you yourself think that Bill Strawn's body had been found?

A. I was told by Detective Norris and Peterson at the Holiday Inn on the night of the 13th that Mr. Strawn's body was found in his residence in Montgomery County.

Q. What was the next thing the defendant said or asked you after this conversation you told us about the fingerprints?

A. He told—stated to me, said that his fingerprint (sic) should be all over Pamela Beene's house because he had been there on at least two occasions and, in fact, had spent a couple nights at Pamela Beene's house back in October when he was attending a coach—some kind of coaching seminar in Houston.

Q. What did—what did you tell him then?

A. He then asked me how long a fingerprint would last once it was laid down. How long would that fingerprint last.

Q. What did you tell him?

A. I told him it depended on the surface that the fingerprint was left on, the weather conditions, whether the object the fingerprint was on was handled a lot, whether it was cleaned off. I told him it would be depend (sic) on a lot of things on how long the fingerprint would last.

Q. What did the defendant say to you then?

A. He told me then, quote, if my fingerprints were found in Pamela Beene's house, they were put there before Mr. Strawn was murdered on the 12th.

The State then proceeded, through a large number of witnesses and exhibits, to attack the appellant's alibi, and to prove that appellant wanted harm to come to the victim and had the opportunity and means to personally do harm to the victim.

One student testified that appellant's appearance had changed upon appellant's return to school after December 12 in that appellant did not have his mustache and his hair appeared shorter and darker. Another student related to the jury how she was part of a conversation with appellant as to how to commit the perfect crime or murder. Albert Hill, the substitute teacher for appellant on December 12 testified that appellant did not leave a lesson plan for him.

Friends of appellant, Sterling Mize and Dennis Carver who lived in a house on 7th Street in Lubbock, testified that appellant was aware of how to enter the 7th Street house at any time should no one be at home. Carver further testified that sometime between 5:30 a.m. on December 10, 1988, and 11:00 p.m. on December 13, 1988, someone removed his loaded Smith and Wesson .357 magnum pistol from his room. The pistol was never recovered. The State introduced evidence that Carver's pistol contained .357 caliber bullets taken from a box of reloaded .357 shells, and when a sample of the lead contained in these reloads was scientifically compared to the lead slug taken from the skull of the victim, the results indicated that the lead contained in Carver's box of .357 shells was "analytically indistinguishable" or "generally similar" to the lead slug removed from the victim's skull. Furthermore, a ballistics expert from the Houston Police Department testified that, in his opinion, the lead slug removed from the victim's skull was either a .38 or .357 caliber bullet. This witness also testified to the fact that a computer test run on the lead slug revealed that the slug could have been fired from a .38 or a .357 caliber pistol, and that Smith and Wesson was among the possible manufacturers.

The State next called Charles Sterling, Timothy Hendrix, Zelmo Bell, Charles Wilson, and Charles Hill to testify that each had been solicited by appellant to do a variety of suspicious, if not criminal, acts. Charles Sterling was one of the key witnesses for the State. Sterling testified to the fact that beginning on December 8, 1988, he received a series of phone calls from appellant made to Sterling's residence in Lubbock. This was verified by appellant's telephone records, State's Exhibit 118. Sterling testified that he was surprised to hear from appellant after not having any contact with appellant for a couple of years. Sterling related that on December 9, 1988, appellant called Sterling and told Sterling that he (appellant) was "having a problem and he felt he was getting some pressure from somewhere in the Houston area, and if I know (sic) anybody down there that might check it out for him." Sterling stated that appellant never

used any other term than "getting pressure." When asked by appellant if Sterling knew anyone in Houston that could "find out where the pressure was coming from," Sterling replied that he (Sterling) had a brother there that might be able to find out something.

Although the phone records contained in State's Exhibit 118 end with a December 16, 1988 phone call, Sterling stated that he received a call from appellant on a date he was not sure of. In this conversation, appellant told Sterling that "he had a phone call on his phone records that he needed covered and if I knew anyone down there that could cover that call." Appellant explained that he (appellant) needed someone to say they made the call from Houston and charged to appellant's phone. Appellant stated that he needed the cover so that he (appellant) would not be placed in Houston. Appellant told Sterling that the cover story was to be told to the police "that were down there at the time." Sterling told appellant that Sterling's brother, Bobby, could get a girl to say that Bobby made the call. Sterling testified that appellant did not say why he (appellant) did not want to be placed in Houston, but that appellant did tell Sterling that he (appellant) was a suspect in a murder. Even after this, Sterling testified that he thought appellant's trouble in Houston had something to do with gambling or owing someone money.

During the direct examination of Charles Sterling, the State pointed out that one of the calls listed on State's Exhibit 3, which contained an itemized listing of phone calls charged to appellant's phone from October 19, 1988 through December 17, 1988, was a call made on December 11, 1988 at 11:32 p.m. to Charles Sterling's residence in Lubbock. Later testimony would reveal that the call originated from a phone located at the Marriott Hotel located on the grounds of Houston Intercontinental Airport. Sterling further testified that he set up the cover story with his brother, Bobby.

Charles Sterling also testified that appellant made up an alibi for December 11 and 12 and Charles Sterling agreed to tell the story to the authorities should they question him. The alibi was to the effect that on the night of December 11, appellant and Sterling were to have met at Sterling's residence in Lubbock and go out partying, but Sterling was to have forgotten and ended up at Sterling's girlfriend's residence, and then at approximately 4:30 a.m. on December 12, as Sterling is headed to work, Sterling was to see appellant leaving Sterling's apartment complex but did not talk to appellant. Sterling admitted to the jury that, although this is the story he (Sterling) initially told the police, the whole story was a lie made up by appellant. Sterling also testified that appellant said that he (appellant) was going to get Charles Hill to cover for appellant in the same way.

Charles Sterling further testified that after relating to the police the story appellant had made up, the police confronted Sterling with appellant's phone records, and at that point Sterling knew the lie was not going to work. At that point, Sterling agreed to work with the authorities and agreed to wear a body microphone so that the authorities could record a subsequent conversation between Sterling and appellant. The tape, State's Exhibit 114A, was played for the jury. Sterling testified that during the taped conversation, appellant told Sterling to stick to the false story and everything would be alright. This is confirmed by a portion of State's Exhibit 114A which we have listened to.

Bobby Sterling was called to testify by the State and confirmed the fact that his brother Charles contacted him in order to set up the cover for the phone call made from the Marriott Hotel on December 11. Bobby stated that he did not go to the Marriott and make a call to his brother Charles on December 11. Bobby further testified that he was home from work the morning of December 12, 1988 because his construction job was cancelled that day due to freezing rain in Houston. When asked by the State if he (Bobby) ever went to the Woodlands; if he knew where number seven Briarvine in the Woodlands was; if he killed a man on December 12 by shooting the man in the back of the head; or if he knew anything about the murder of Bill

Strawn, Bobby answered, "No, sir," each time.

The State's next witness, Tim Hendrix, was a general contractor and a friend of appellant. Appellant's brother, Stan, had worked for Hendrix in housing construction. Hendrix had also met Pam Beene when she and appellant were dating. Shortly before Thanksgiving 1988, Hendrix received a phone call from appellant in which appellant related to Hendrix that he (appellant) "was really looking for somebody to do a job for him, ..." When Hendrix pressed appellant as to the type of "job" appellant needed done, appellant replied that he "wanted someone to find out if Pam and a guy she was dating if they were going to get married and if they were to see if he could have of (sic) the guy run off." Appellant asked if Hendrix would personally do the job and Hendrix replied that he did not do anything like that. Appellant then asked if Hendrix would put Zelmo Bell on the phone. Bell worked for Hendrix and appellant knew Bell through appellant's brother, Stan. Hendrix testified that appellant called Hendrix several times after this initial call regarding the "job." Hendrix related that appellant seemed "obsessed" with Pam at that time. Hendrix further testified that after appellant talked to Zelmo Bell, appellant called Hendrix and asked him to give a name and address to Bell. The name was "Bill Strawn," and the address was supposed to be where Strawn could be located.

Hendrix further testified that through subsequent conversations with appellant, Hendrix learned that appellant had sent Zelmo Bell $200 via Western Union. Appellant related to Hendrix that the $200 was "for somebody to go to Houston." Hendrix further testified that during a New Year's Eve party which he and appellant attended together, appellant asked to speak to Hendrix in the bathroom. Alone in the bathroom, appellant related to Hendrix that Bill Strawn, the person whose name appellant had given Hendrix to give to Zelmo Bell, had turned up dead in Houston. When asked by appellant's trial counsel if he knew Zelmo Bell's whereabouts on December 12, 1988, Hendrix replied that

Bell came by Hendrix' house at about 8:30 or 9:00 a.m. and told Hendrix that he (Bell) was going to Dallas to pick up Bell's brother who had gotten stuck on the road in Dallas.

Zelmo Bell testified that in their initial telephone conversation, appellant told Bell that he (appellant) was having problems with his girlfriend who was in Conroe, and that appellant asked Bell if Bell knew "anybody that could rough up a guy for him, to make him leave his girlfriend alone." When Bell told appellant that he (Bell) probably did know of someone, appellant attempted to arrange a meeting with Bell in Conroe. Appellant told Bell that appellant "could fly into Houston and drive and meet me here." Bell told appellant that it would cost $200–$300 to have the person "roughed up." Bell then asked appellant what would happen if the "guy" still would not leave appellant's girlfriend alone, and appellant replied by asking Bell if Bell could find someone "to have him knocked off." Bell again responded that he (Bell) probably could find someone but the price would be $4000–$5000. Bell gave appellant his name and address, and appellant wired Bell $200 through Western Union. Subsequent testimony as well as Western Union records, State's Exhibits 124 and 125, confirm that on December 2, 1988, appellant wired Bell $200.

Charles Wilson took the witness stand and stated that he first met appellant on December 6, 1988 through Corey Williams. Wilson positively identified appellant in court as the man Corey brought to Wilson's house on December 6. According to Wilson, appellant was at Wilson's house to get Wilson's response to a request appellant had apparently sent to Wilson through Corey. Wilson testified that the gist of appellant's request was "that he wanted this man knocked off in Houston." Wilson testified that "knocked off" meant "killed" to him (Wilson). Wilson further testified that appellant said Wilson would be paid $750 to do this; that appellant had booked a flight out of Lubbock on Southwest Airlines and that Wilson would need a fake identification when arriving in Houston in

order to rent a car without giving his (Wilson's) real name; that the man appellant wanted knocked off lived in the Woodlands, but did not give the name of the man; that appellant would show Wilson where the man lived and worked, but appellant did not want the man killed at home because the man had a wife and kid and appellant did not want them hurt; that appellant wanted Wilson to "get the guy" leaving work and Wilson was to take the man's jewelry and money and make it look like a robbery. Wilson told appellant that he (Wilson) would have to think about it and gave appellant his phone number to contact Wilson the next day. Appellant, however, called Wilson that evening and Wilson told appellant that after thinking about it he did not want anything to do with it. Appellant inquired if the money was not enough for Wilson but Wilson replied that he just did not want to do it. After this conversation, appellant called Wilson again that same evening asking Wilson if Wilson knew anyone who would do it. Appellant called Wilson the next day with the same question and Wilson told appellant that he (Wilson) "knew some guys but they didn't want anything to do with it either."

The next major witness for the State was Charles Hill. Hill was a college friend of appellant's, and had not seen appellant from 1977 to 1987. Hill testified that appellant phoned Hill at Hill's place of employment on December 8, 1988. This surprised Hill as Hill had not had any contact with appellant since seeing appellant in a club approximately one year earlier. Hill related to the jury that one of the first things appellant asked Hill in the December 8 phone call was if Hill was alone in the office by himself. Hill told appellant that he was alone, but in fact two of Hill's coworkers were also in the room. The State's direct examination of Hill continued as follows:

Q. (the State) Well, what did he actually say?

A. (Hill) He said he wanted—me to do him a favor.

Q. What did you tell him when he said that he wanted you to do him a favor?

A. I said sure, if I could.

Q. Did you ask him what the favor was?

A. He told me, that's when he told me that he wanted me to take care of somebody.

Q. What did you say, or what did he say after he said he wanted you to take care of somebody?

A. I asked him, I said, I hope you don't mean what I think you mean.

Q. And what did he say?

A. He said yes.

Q. And his words were he wanted you to take care of somebody?

A. Yes.

Q. Did he ask you if you could do it?

A. Yes.

Q. If you couldn't do, did he ask you whether you could arrange it?

A. He asked me if I knew anybody that could.

Q. What did you tell him?

A. No on both counts.

Q. How did you react to this?

A. I was surprised because me and Jon were friends in college. We had some good times together and I was just basically surprised that he would ask me something like that.

Q. How did the conversation end?

A. He wanted Charles Sterling's number before we hung up, and that's about it.

Q. Now, you knew Charles Sterling from college?

A. Yes. Me and Charles are friends.

Q. To your own knowledge did Jon Weatherred know Charles Sterling from college, also?

A. Yes, he did.

Q. The records show, Mr. Hill, that there's a phone call made at 5:17 P.M. on December 12, 1988, either to your home or to your office. Were you working at 5:17 P.M. on December the 12th?

A. No, I wasn't.

Q. What time had you worked, if you had, on December 12th?

A. I would go in—it would be early in the morning, because I was working the third shift at that time.

Q. What time did you go to work on December 11th?

A. I usually left the house around 9:30 P.M.

Q. And what time did you get home?

A. About 5:30 A.M.

Q. In this call at 5:17 P.M., did you talk to Jon Weatherred?

A. Yes, I did.

Q. Were you at your home or at your office?

A. I was at home.

Q. What did the defendant say or ask you in this phone call?

A. He asked if I worked the previous night and what time I had gotten off.

Q. What did you tell him?

A. I told him yes I had worked, and I had gotten off about 5:30 that morning.

Q. What did the defendant then say after he found out that you had gotten off work at 5:30?

A. He told me—asked me to say we had breakfast that morning.

Q. Did he say where y'all were to have had breakfast together?

A. No.

Q. Say what town?

A. No.

Q. He said if anyone asked, say that y'all had had breakfast together that morning?

A. (Indicates yes.)

Q. Did he give you a time?

A. No, he didn't.

Q. What did you say when he asked you that?

A. I told him I couldn't do that.

Q. How did this phone call affect you?

A. Well, it made me a little nervous, because I thought it pertained to the conversation we had a few days ago at work.

Q. Did you—did he hang up on you, or did you hang up on him?

A. It was cut short, but I didn't want anything to do with anything that he had been talking to me about the last couple of conversations.

The State next elicited testimony from witnesses who established that the Marriott Hotel, Houston Intercontinental is actually on the grounds of Houston Intercontinental Airport, with the Hotel being connected to the airport by means of an underground tunnel in which guests can travel to and from the airport. Also, any guest paying in cash was not required to provide identification. Thus, a cash-paying guest could register under any name and be provided accommodations with no other questions asked. Similar testimony was elicited from three airline representatives. Southwest, Delta, and American Airlines have flights from Lubbock to Houston and back, and each airline requires no identification if a passenger is paying in cash. A last name is required by Southwest Airlines, and American Airlines requires a name only to verify reservations, but apparently the name given is not matched to any tangible piece of identification by any of the airlines. Furthermore, the Southwest Airlines representative testified that no security screening is conducted on any luggage going into the body of the plane. Apparently, the rule with regard to domestic flights is that only carry-on luggage is screened through a metal detector and x-ray machine prior to being allowed on a plane.

The State also elicited testimony from Tom Bevel, a crime scene reconstruction expert, to the effect that after examining crime scene photos and the blood spatters on the victim's shirt, he was of the opinion that the murderer's clothes would not have received much if any blood spatter. Furthermore, Bevel was of the opinion, based upon the location of the entry wound and the path taken by the bullet as well as the various blood stain patterns, that the murderer was more likely left-handed than right-handed. Previously elicited testimony from Pam Beene indicated that appellant once told her that he (appellant) was ambidextrous and his son, Josh, was showing signs of being the same way. Also, Fred Oliver, one of the coaches who hunted with appellant on the December 10–11,

1988 weekend, testified that, to the best of his memory, it seemed like appellant was left-handed when shooting a gun.

The State's final two witnesses in its case-in-chief were its alleged eye-witnesses. Nichole Rogers, a 12 year old whose house is directly across from 7 Briarvine, testified that at approximately 7:55 a.m. on December 12, 1988, she had run out the front door of her house to see if her school bus had passed its pickup point. In doing this, Nichole happened to look across the street and noticed Pam Beene's garage door open with the victim's car still inside. Nichole also observed a white man in the garage squatting next to the driver's side door. The white man was wearing a brownish, tan, or grey jacket with a fuzzy collar. Although Nichole only observed the man for about 3 to 5 seconds and could not actually see the man's face because the man was squatting facing away from Nichole, nevertheless Nichole positively identified appellant in court as the man she saw in Pam Beene's garage at 7:55 a.m. on the morning of December 12.

Beatrice Martinez was the State's next witness. Ms. Martinez lived in a house situated directly behind the house in which Nichole Rogers lived. Ms. Martinez testified that sometime between 7:15 to 7:30 a.m. on December 12, 1988, while standing in her garage and looking out the garage door windows, she observed a man walking up her driveway. Ms. Martinez stated that as the man approached closer, she paid more attention to him, actually studying the man's face in order to figure out who he was. According to Ms. Martinez, the man wore a tan, or brown jacket and grey slacks. When shown State's Exhibit 116, which had been previously identified as appellant's hunting jacket with a fleecy, woolen collar, which was recovered from appellant's residence during the execution of a search warrant, Ms. Martinez agreed that it appeared to be the same or similar to one the man was wearing. Ms. Martinez then positively identified appellant as the man she saw walking up her driveway the morning of December 12, 1988.

The State presented several witnesses in rebuttal. Significantly, the State provided evidence accounting for the whereabouts of Pam Beene's ex-husband, Andy Beene, on the morning of December 12, 1988. Andy Beene's employer testified that Andy was indeed at work in Lubbock by 8:00 a.m. on December 12. Business records of December 12 containing Andy Beene's handwriting verify his presence at work that morning.

The most compelling rebuttal testimony came from Ty Young who lived in Irving, Texas, but grew up in Kress and had known appellant all his (Young's) life. Young testified that he, too, went to Kress on the December 10–11, 1988 weekend to hunt and did so. Young further testified that he arrived at the Lubbock airport at about 5:00 p.m. on December 11, 1988 to return home. Young stated that sometime between 5:15 to 5:45 p.m., he saw appellant at the Lubbock airport. In fact, Young stated that he and appellant carried on a conversation for a couple of minutes in the airport, and later while on board the Southwest Airlines 6:00 p.m. flight to Dallas, Young observed appellant walking up the aisle of the plane. Young even asked his aunt, Charlene Little, who was sitting next to Young on the plane, if she had noticed appellant just walk by. Young further testified that he later noticed appellant in the luggage area at the Dallas airport but had no further conversation with appellant.

With the conclusion of Young's testimony, the case for the State ended.

In setting forth the above facts as we have, we do not mean to imply in any way that appellant's defense attorneys did nothing but sit on their hands through the entire trial. Indeed appellant's attorneys countered each piece of probative evidence presented by the State with equally probative evidence or neutralizing cross-examination. For example, whereas the State presented two witnesses identifying appellant at or near the scene of the crime on December 12 and one witness identifying appellant on a plane headed in that direction, appellant's defense team presented three witnesses that placed appellant in

Plainview at approximately 8:00 a.m. on the morning of December 12 and another witness who placed appellant in Lubbock at approximately 10:30 p.m. on December 11. As noted at the outset of this opinion, the law mandates that we examine the facts in the light most favorable to the verdict. Having cast these facts in such a light, we do so with all due respect to the defense prepared and presented by appellant's attorneys.

■ In beginning our discussion of the law with regard to appellant's sufficiency point of error, we cannot stress enough the axiomatic rule of Texas law that provides that the jury is the *exclusive* judge of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony. *See*, Tex.Code Crim.Proc.Ann. art. 38.04 (Vernon 1979); *Sharp v. State*, 707 S.W.2d 611 (Tex.Crim.App.1986), *cert. denied* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988); *Hudson v. State*, 418 S.W.2d 813 (Tex.Crim.App.1967). Indeed, the law fully provides that a jury may believe a witness even though the witness's testimony has been contradicted; and that a jury may accept any part of a witness's testimony and reject the rest. *Sharp, supra* at 614; *Jackson v. State*, 505 S.W.2d 916 (Tex.Crim.App.1974); *Dawson v. State*, 472 S.W.2d 775 (Tex.Crim.App.1971).

Furthermore, this Court must be guided by the principles contained in the following language taken from *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988), which provides:

> The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign or weigh evidence. This the factfinder has already done. The factfinder, best positioned to consider all the evidence firsthand, viewing the valuable and significant demeanor and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by ... the evidence, with such evidence being viewed under the

*Jackson* light. Concrete application of the *Jackson* standard is made by resolving inconsistencies in the testimony in favor of the verdict. (footnote omitted).

In examining the extensive testimonial and physical evidence presented to the jury, and ever mindful the earlier quote from *Jackson v. Virginia* regarding the trier of fact's responsibility to resolve conflicts in testimony and draw reasonable inferences from basic facts to ultimate facts, we cannot say that a rational trier of fact could not have found each element of the offense charged beyond a reasonable doubt. The crux of appellant's first point of error is that because the State requested no "parties" charge,[2] the State was required to prove beyond a reasonable doubt that appellant was *"the "* person who fired the weapon causing the death of the victim; and that an "inference other than the Appellant pulling the trigger is that an unknown person, probably left-handed, fired the weapon causing the death of WILLIAM STRAWN."

■ Appellant misinterprets the "reasonable hypothesis" analytical construct used in circumstantial evidence cases. We point to the language quoted from *Russell v. State*, set out at the beginning of this opinion, which speaks in terms of "the combined and cumulative force of all the incriminating circumstances," as well as the principle that "every hypothesis" need not be excluded by the State. We read *Russell* to say, among other things, that once the State has presented all of its evidence, any differing hypothesis of how the crime occurred and/or who committed the crime must be "a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence." *Russell, supra*. Appellant's "unknown person" hypothesis, we find, is not a reasonable one based upon the facts and circumstances contained in the record before us and examined in the light most favorable to

2. *See*, Tex.Penal Code Ann. secs. 7.01 and 7.02       (Vernon 1974).

the verdict. Appellant's first point of error is overruled.

We now skip to appellant's fifth point of error which states:

The trial court erred in refusing to allow, over objection, State's Exhibit 114A in its entirety to be received by the jury after the jury requested it three times. The trial court erred in failing to follow the mandatory requirements of article 36.27 of the Texas Code of Criminal Procedure.

Although the point is multifarious, we are compelled to address it as we find no flagrant violation of the rule. *See,* TEX. R.APP.P. 74(p).

State's Exhibit 114A is an audio cassette tape containing two conversations. The entire first side and approximately one-half of the second side contains a conversation between Charles Sterling and the appellant. Recall that Charles Sterling had agreed to wear a body microphone and meet appellant in Sterling's attempt to cooperate with the authorities investigating the murder. The second conversation on the second side of State's Exhibit 114A was identified as one between Charles Sterling and either Sergeant Tracy Peterson of the Montgomery County Sheriff's Department or Detective Ricky Staggs, although Sergeant Peterson identified his voice as the only law enforcement officer's on the tape. The critical portion of this conversation, as far as appellant was concerned, is a portion of the tape containing the following:

Peterson/Staggs: ... or either he went down there because your brother couldn't find him somebody to do it and did it himself and needs an alibi for that, it still don't mean he didn't do it. But you see now that he's into this up to his neck? Do you believe us now?

Sterling: I believe you, man....

———————

Sterling: What really put some doubt in my mind at first, you know, about that he didn't do it was he didn't even know where the fucker was shot....

Peterson/Staggs: At least he acts like he didn't know where the guy was shot at, you know.

Sterling: I just knew, you know, when I said that, you know, that, you know, that right there would say, you know, that would tell me something if he knew where the guy was shot at, you know, without me saying nothing ... I don't know, man....

Peterson/Staggs: The—ah,—you know, I don't know. But he was in Houston paying somebody for that job. Maybe your brother did know somebody that'd do it. You know what I mean?

———————

Peterson/Staggs: No, I'm not talking about your brother, I'm just talking about maybe your brother knew somebody that'd do it and he turned him on to Jon.

In carefully examining the record before us, it is clear that the only discussion involving deletion of any portion of 114A dealt with the words "lie detector" being mentioned, but that issue was ultimately resolved apparently without the need to delete the "lie detector" portion. Other than that issue, the record reflects that 114A was admitted in its entirety. The record further reflects that once the first side was played to the jury, Sergeant Peterson turned the tape to the other side and the court reporter's marginal notation reads as follows:

(WHEREUPON THE WITNESS TURNED THE TAPE OVER AND CONTINUED TO PLAY IT FOR THE JURY UNTIL THE END OF THE TAPE.)

Following the playing of the tape before the jury, Sergeant Peterson was cross-examined by appellant's counsel with the following portion being pertinent to our analysis:

Q. (appellant's counsel) You told him that you felt like Bobby Sterling had something to—that he was involved; didn't you?

A. No, sir.

Q. What day was the taped interview taken?

A. The taped interview?

Q. The body mike that you placed on Charles Sterling?

A. The date?

Q. Yes.

A. It was on the 8th.

Q. Is it your sworn testimony that you never stated to Charles Sterling at any point that day that you felt Bobby Sterling was involved in this killing?

A. Yes, sir.

Q. Who all was present while the recording was being made of Jon Weatherred?

A. Where the receiver was?

Q. Yes.

A. Myself and Detective Staggs.

Q. Did Detective Staggs ever make a statement to Charles Sterling in your presence that he felt Bobby Sterling was involved?

A. No, sir. I can't remember Detective Staggs saying that.

Q. Did you ever tell Charles Sterling that he was in Houston paying somebody to pull that job, maybe your brother did know somebody that would do it?

A. Did I tell him that?

Q. Yes.

A. No, sir. I didn't tell him that.

Q. Did Detective Staggs tell him that?

A. No, sir.

Q. Are you saying that statement didn't happen?

A. I didn't tell him that, and I was in the interview the whole time with Detective Staggs and I don't recall him telling him that either.

Q. And you would recall something like that?

A. Yes, sir. I probably would.

Q. And it is your sworn testimony that never happened?

A. Yes, sir.

---

Q. And who was present when you met on the highway?

A. Charles Sterling, myself, and Detective Staggs.

Q. Nobody else?

A. No, sir.

Q. So, any voices on a recording would be either yours, Staggs, or Charles Sterling?

A. Probably be mine or Sterling, because—

Q. Charles Sterling told you that he had some doubt that Jon did it, even after talking with him about this?

A. Yes.

Q. And that he didn't even know where the man was shot?

A. Who didn't know?

Q. Charles Sterling told you that Jon didn't even know where the man was shot?

A. I don't remember him saying that. We had a conversation about the fact that he wore the mike on the way back to Lubbock.

Q. You also told him, or Ricky Staggs told him, that I am not just talking about your brother, I am just talking that maybe your brother knew somebody that would do it and that he turned them on to Jon, do you remember that statement?

A. That's possible that that statement was made.

Q. Who would have made that statement?

A. Either Detective Staggs or myself.

---

Q. I recognize that, but at the time that you met out there on the highway and you were talking about what you had told Charles Sterling and what Charles Sterling had just recorded from Jon Weatherred, you told him that you thought Bobby Sterling had something to do with this case, didn't you?

A. Counsellor, I can't recall if I did or not.

Q. That's something that would be pretty important, wouldn't it, Detective Peterson? I mean, you swore out an arrest warrant for Jon Weatherred immediately after that, didn't you?

A. Yeah, but what does that have to do with Bobby Sterling?

Q. Well, the point is, that you told Charles Sterling at that point that you thought his brother, Bobby, had something to do with it; is that right?

A. I may have told him that his brother could be involved.

After both sides had rested, the record reflects a note from the jury during their guilt/innocence deliberations addressed to the trial court containing the following: "Your Honor: May we have the tape in evidence and a tape recorder. Thank you [signed by the foreman]." The record also seems to indicate that prior to the note being sent out, a bench discussion occurred in which both the State and the trial court discuss, with appellant's counsel present, the fact that the conversation between Charles Sterling, Ricky Staggs and Tracy Peterson was not played before the jury, although the trial court admits that appellant's counsel used that portion in their cross-examination of Peterson. The record reflects that this bench conference occurred at the end of the day's deliberations, and the State volunteered to make a copy of State's Exhibit 114A to give to the jury the following day with the Sterling–Staggs/Peterson portion deleted.

The record further reflects that the following day, the State provided the trial court with "State's Exhibit 114B" which was characterized by the trial court as having had deleted "the inadmissible portion of 114A." Appellant's counsel timely objected to providing the jury with 114B as 114A was admitted in its entirety and without qualification, except for the "polygraph" or "lie detector" portion. The trial court stated that he (trial court) had permitted appellant to argue the Peterson/Staggs–Sterling conversation to the jury because it was within the scope of appellant's cross-examination of Tracy Peterson, not because that portion of the tape was played to the jury. The trial court, however, did admit that his exhibit record "just says 114 and 114A admitted. It was the part that was—I don't know. They only played one part." Appellant's objections were ultimately overruled, and 114B was sent into the jury room. We have compared 114A and 114B and, indeed, 114B does not contain the conversation between Sterling, Staggs and Peterson.

TEX.CODE CRIM.PROC.ANN. art. 36.25 (Vernon 1981) states: "There shall be furnished to the jury upon its request any exhibits admitted as evidence in the case." The seminal case on this point is *Lopez v. State*, 628 S.W.2d 82 (Tex.Crim.App.1982). The *Lopez* court discussed art. 36.25 and concluded:

> The language of said statute indicates that a jury may take with them any exhibits admitted as evidence, though a refusal or failure to allow the jury to have such exhibits is not error *unless* the jury requests the exhibits. (emphasis ours).

*Lopez, supra* at 85.

The trial court's failure to provide the jury with an exhibit upon the jury's request was again addressed in *Parker v. State*, 745 S.W.2d 934 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). We find the following analysis by the Houston Court in *Parker* quite compelling in relation to the instant case.

> Neither Tex.Code Crim.P.Ann. art. 36.25 (Vernon 1981) nor case law requires that the jury give any reason or justification when requesting to view evidence properly admitted. *See generally Robinson v. State*, 704 S.W.2d 565 (Tex. App.—Beaumont 1986, pet. ref'd); *see also Garrett v. State*, 658 S.W.2d 592 (Tex.Crim.App.1983). Unlike art. 36.25, which addresses exhibits admitted into evidence, Tex.Code Crim.P.Ann. art. 36.28 (Vernon 1981) concerns the testimonial evidence admitted. "[I]f the jury disagrees as to the *statement of a witness* they may, upon applying to the court, have read to them ... that part of such witness testimony or the particular point in dispute, and no other...." *Id.* Clearly, the court has the power to determine the validity and extent of the jury's request when testimony is in dispute. However, art. 36.25 is mandatory, and we are persuaded by the reasoning in *Lopez v. State*, 628 S.W.2d 82 (Tex.Crim. App.1982), that error occurs when the jury requests an exhibit and the court refuses to comply. *Id.* at 85.

*Parker, supra* at 936.

■ We hold, therefore, that the trial court committed error in refusing to send

in State's Exhibit 114A to the jury as that was the exhibit offered by the State without qualification and admitted by the trial court without qualification, except for the "lie detector" issue, before the jury. Appellant's counsel was permitted, without objection from the State, to cross-examine Peterson on the portions of the tape dealing with the key defensive issue of the case. The cross-examination of Peterson quoted above reflects Peterson's total denials as well as the rather equivocal "that's possible" and "may have" when asked if he or Staggs had ever told Charles Sterling that Sterling's brother was involved in somehow placing appellant in touch with the ultimate triggerman. It cannot be denied that actually hearing, from their own lips, the lead investigators' theory of the case that appellant paid someone to be the actual triggerman, could be decisive since the jury was only authorized to convict if it found that appellant was the triggerman.

The State's brief provides us with no authority contrary to *Lopez* and *Parker*. Indeed, the State's initial counter-argument under point of error five is essentially the concept rejected in *Parker*. The State in the instant case insists on treating State's Exhibit 114A as quasi- or ersatz-testimonial that is divisible based upon what the jury actually heard during the trial. No such limitation was placed upon it during the trial when the State sought to introduce it. Certainly until one of the parties formally presents the trial court with an objection to a portion of the tape *and* the trial court formally sustains the objection and rules that the portion be stricken, as occurred with the "lie detector" portion, the full contents of the tape, as an exhibit controlled under art. 36.25, are in evidence whether or not the full contents has been played for the jury. It was error, therefore, for the trial court to withhold the remaining portion of State's Exhibit 114A from the jury. Indeed, we question whether 114B could even be properly provided to the jury under art. 36.25 as it was never formally "admitted as evidence in the case."

■ Having found error in the proceedings, we hold that said error was reversible in that we are unable to determine beyond a reasonable doubt that the error made no contribution to the conviction. TEX. R.APP.P. 81(b)(2). We note that the proper application of Rule 81(b)(2) *mandates* reversal unless the appellate court can conclude beyond a reasonable doubt that the error did not contribute to the conviction. *Harris v. State*, 790 S.W.2d 568 (Tex.Crim. App.1989); *Mallory v. State*, 752 S.W.2d 566 (Tex.Crim.App.1988). Indeed, we, as the reviewing court on this issue, are obligated to examine the entire record in a neutral, impartial and even-handed manner and not in the *Jackson v. Virginia* "light most favorable to the verdict...." *Harris, supra* at 586. As the *Harris* court points out, "A review of the evidence in this manner is necessary because, for example, an error can be harmful when it has the effect of disparaging a defense, whereas if there is no defense the error could have been harmless." *Id.* As noted before, it cannot be seriously denied that in the instant case the uppermost defensive theory was that someone other than appellant committed the murder. Submitting an application paragraph to the jury in which appellant must be found to be the actual triggerman beyond a reasonable doubt makes any piece of evidence to the contrary that more crucial. As stated earlier, the appellant's defense attorneys presented probative evidence on behalf of their client as well as vigorous cross-examination of State's witnesses that was highly effective in offsetting or counterbalancing the State's witnesses' direct examination testimony. Such a closely contested case resting almost exclusively on circumstantial evidence raises the reasonable doubt in our minds that, if the jury had been permitted to hear the key investigative officers in the case express their theory that appellant was not actually the triggerman, but paid someone else to do the job, a verdict of guilt would nevertheless have followed. As stated in *Harris*, "If the error was of a magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter

how overwhelming it might have been, then the conviction is tainted." *Harris, supra* at 588. We so find that the error was of such a magnitude. Appellant's Point of Error 5 is sustained, the judgment of the trial court is reversed, and the case remanded to the trial court for a new trial.

We decline to address the remainder of appellant's points of error.

REVERSED AND REMANDED.