Jon David **WEATHERRED**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09-95-225-CR.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 18, 1997.

Decided Jan. 21, 1998.

Daniel W. Hurley, Lubbock, for appellant.

Michael A. McDougal, District Attorney, Gail Kikawa McConnell, Assistant District Attorney, Conroe, for Appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

A jury convicted appellant of Capital Murder. As the State was precluded from seeking the death penalty in this trial,[1] appellant's punishment was assessed at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Appellant raises six points of error for our review. As point of error one complains of the lack of legally sufficient evidence to sustain the conviction, we must address it initially. *See Edmonson v. State,* 951 S.W.2d 6 (Tex.Crim.App.1997).

In reviewing the legal sufficiency of the evidence, we determine whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard of review is the same for both direct and circumstantial evidence cases. *Geesa v. State,* 820 S.W.2d 154, 159–161 (Tex.Crim.App.1991). In an attempt, we perceive, to crystallize the distinction between appellate review of *legally* sufficient evidence as opposed to review of *factually* sufficient evidence, the Court of Criminal Appeals in *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996), described review of legal sufficiency as follows:

> A *Jackson* review, "viewing the evidence in the light most favorable to the prosecution," is not a factual sufficiency review; rather, it is an analytical tool used to determine whether there is a fact issue at all. (footnote and citation omitted) The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (footnote omitted) *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

In examining the record for legally sufficient evidence to sustain the conviction, we recognize that the jury may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *Wawrykow v. State,* 866 S.W.2d 87, 88–89 (Tex.App.—Beaumont 1993, pet. ref'd). Furthermore, a reviewing court's legal sufficiency review is a very limited one.

1. The instant case was first tried in 1989 resulting in a guilty verdict and an assessment of life by the jury. This Court reversed the conviction and remanded the cause to the trial court for a new trial. *See Weatherred v. State,* 833 S.W.2d 341 (Tex.App.—Beaumont 1992, pet. ref'd).

We do not serve as a "thirteenth juror in assessing the evidence." *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). Instead, we act only "as a final, due process safeguard ensuring only the rationality of the factfinder." *Id.*

■ In the instant case, both the State and the defense presented very lengthy and detailed cases involving witnesses from all over the State of Texas as well as from areas outside the state. However, appellate review of legal sufficiency no longer requires application of the "reasonable hypothesis analytical construct." *See Geesa,* 820 S.W.2d at 154. Now our basic focus is on locating any evidence, viewed in the light most favorable to the prosecution, which is sufficient to raise a fact issue as to appellant's guilt when presented to any rational trier of fact. In the instant case, a lengthy rendition of the evidence favorable to the verdict is not necessary.

■ As was the situation in the first trial, the State's evidence of appellant's involvement in the murder of Bill Strawn was almost entirely circumstantial. No physical evidence, such as fingerprints, footprints, hair, or fiber, belonging to appellant was discovered at the scene of the murder. Nevertheless, the State meticulously provided the jury with evidence of appellant's motive (jealousy over his girlfriend's new and more serious relationship with the victim), and appellant's opportunity (eyewitness testimony positively identifying appellant's presence in the neighborhood and in the garage of the house where the victim was discovered on the morning of the murder), to have committed the murder.[2]

The testimony placing appellant near the crime scene on the morning the murder took place was significantly compelling in that appellant lived in Kress, Texas, in the Texas "Panhandle," approximately 600 miles from Montgomery County. Furthermore, the State provided evidence that, when initially questioned by Montgomery County authorities, appellant was apparently aware of the specific location where the murder took place. The State also proved that appellant had not been at work on the morning of the murder, that he lied about when he shaved off his moustache, and that he had been asking various acquaintances about locating a "hit man" or "want[ing] some guy killed in The Woodlands." Several witnesses testified to appellant's attempts to provide himself with a false alibi for the morning of the murder.

Further incriminating facts and circumstances in the record before us, and recognized in appellant's brief, include the following:

1. Appellant paid an individual $200 to go to Conroe to "rough up" the victim in hopes that the victim would leave appellant's former girlfriend.

2. Appellant was observed on an American Airlines flight from Lubbock to Dallas on the night of December 11, 1988.

3. A Smith & Wesson .357 handgun was found missing from the residence of a close friend of appellant's between December 10, 1988, and December 14, 1988. Appellant likely had knowledge as to how to gain access to said residence.

4. A box of .357 shells collected from the residence where the .357 handgun was found missing had analytically indistinguishable characteristics from the lead slug recovered from the victim's body.

5. The firearm used to kill the victim could have been a Smith & Wesson .357.

All of the above-described evidence placed in the light most favorable to the prosecution leads us to conclude that any rational trier of fact could have found appellant guilty of the murder of Bill Strawn, in the course of committing robbery or burglary, beyond a reasonable doubt. Appellant's evidence, also quite probative and compelling, can have little if any impact on our review of the evidence for *legal* sufficiency unless it somehow reflects favorably on the State's case. We

2. As the victim's payroll check, credit cards, cash, and vehicle were missing, one count of the indictment alleged that the murder occurred during the commission of a robbery. A second count in the indictment alleged the murder took place during the commission of burglary of a habitation.

therefore overrule appellant's first point of error.

■ We now move to appellant's third point of error as it will be dispositive of his appeal.[3] Point of error three complains of the trial court's refusal to allow appellant to call Dr. Kenneth Deffenbacher as an expert witness on the issue of photo bias and eyewitness misidentification. Prior to discussing the substantive law on the issue, we must first address the State's contentions regarding appellant's alleged procedural deficiencies as to this point of error. The State initially contends that point of error three is "multifarious and presents nothing for review" in that appellant's complaint encompasses two theories, 1) photo bias, and 2) mistaken identification. As we appreciate Dr. Deffenbacher's testimony, and the scientific literature introduced as part of appellant's bill of exception, mistaken identification by eyewitnesses is caused by several reasons, one of which is photo bias. Appellant's point of error therefore does not present a multifarious issue.

■ The State then contends: "Appellant admits that he did not object at trial on the basis that the evidence is admissible pursuant to the Texas Rules of Evidence." The State seems to be mistaken as to who was offering the evidence and whose burden it was to object. The record clearly indicates that appellant was tendering Dr. Deffenbacher and his expert testimony. It was the State's burden to object to this testimony which they did in the following manner at the conclusion of the Tex.R.Crim. Evid. 104(a) & (c) hearing out of the jury's presence:

> [The State]: Judge, I object to it [Deffenbacher's testimony] because it is not helpful to the jury. The Jordan case points out that it is speculative. If what he's done before, his studies, don't aid the jury in coming up with a probability that this person is correct in their identification or even biased from the photographs, then it is simply speculative and it is nothing but—it is nothing but confusion for the jury. It's just more information on a subject that is a matter of credibility and common sense for the jury to decide. Even the witness said he can't come up with a probability and even the witness said it is something for the jury to decide and he can't tell them if they are right or wrong from this.
>
> All jurors and all witnesses have common everyday experiences that allow them to—that help them make this type of decision. The decision for the witness is whether or not what they are saying is truthful and not biased based on the photographs they have seen. And the decision for the jurors as to whether the person is credible and whether or not based on their experience, the type of identification that person made is under credible circumstances. *It is an issue of credibility and it* is an issue for the jury and this witness' testimony is merely speculative and wouldn't aid the jury under Rule 702.

The trial court sustained the State's objection and did not permit Dr. Deffenbacher's testimony to be elicited before the jury. As is also clear from the record reflecting the argument by the State at the conclusion of the hearing, Tex.R.Crim. Evid. 702 was indeed raised as a basis for the inadmissibility of the testimony. Appellant had no burden to object to anything in order to preserve the issue for appellate review as the State's objection was sustained.

■ The State's supplemental brief further contends that Defense Exhibits 52 through 57, consisting of journal articles and various professional studies written by Dr. Deffenbacher and other psychologists specializing in eyewitness identification, were untimely tendered to the trial court as they were presented some five days after the trial court ruled to exclude Dr. Deffenbacher's testimony. The record before us reflects, however, that the State made no objection to appellant's tender of these exhibits to his bill

3. We note that point of error two complains of the lack of *factually* sufficient evidence to sustain the conviction. If we were to analyze this point of error and ultimately sustain it, appellant would be entitled to only a reversal and remand, not an acquittal. *See Clewis,* 922 S.W.2d at 133–134. As our analysis of point of error three will result in a remand for a new trial, we forgo consideration of point of error two and the remaining points of error.

of exception. Therefore, the State has waived any appellate consideration that Defense Exhibits 52 through 57 were presented untimely and are not a part of the appellate record.

We now turn to the substantive complaints regarding Dr. Deffenbacher's testimony. The State contends that appellant failed to carry his burden to show that the testimony was admissible by failing to show that the testimony was reliable and that it was relevant. The leading Texas cases on the issue at present are *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992), which was available at the time of the trial of the instant case, and *Jordan v. State,* 928 S.W.2d 550 (Tex.Crim. App.1996), which was not available. Both cases discuss, and rely heavily upon, the United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which basically holds that the *Frye* [4] "general acceptance in the particular field" standard for admissibility of expert opinion testimony was superceded by Federal Rule of Evidence 702. The *Daubert* examination and interpretation of Federal Rule of Evidence 702 is of significant import to Texas law as Tex.R.Crim. Evid. 702 is identical to its federal counterpart. Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Kelly,* the Court held that a trial court's task under Rule 702 is to determine whether the proffered scientific expert testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Id.* at 572. The Court in *Jordan* had before it the issue of relevance as the court of appeals opinion had held that the expert testimony did not sufficiently "fit" the facts of the case. *Jordan v. State,* 877 S.W.2d 902, 905 (Tex. App.—Fort Worth 1994), *rev'd,* 928 S.W.2d 550 (Tex.Crim.App.1996). The Court of Criminal Appeals analyzed the Fort Worth Court's conclusions in the following manner:

> In reaching its decision, the court noted Finn [the expert] did not testify about several factors that might have affected the reliability of the eyewitness identifications present in this case, such as the length of time appellant was viewed by the witnesses, the lighting conditions, or the physical descriptions of appellant initially given by the witnesses prior to viewing the photo line-up. In addition, Finn did not interview the witnesses or examine certain pieces of evidence, although he admitted doing so would have aided his opinion as to the reliability of the identification.
>
> Although Finn did not testify as to *every conceivable factor* that might affect the reliability of eyewitness identification present in this case, interview the witnesses, or examine certain pieces of evidence, his testimony was sufficiently tied to the facts to meet the simple requirement that it be "helpful" to the jury on the issue of eye witness reliability. The Court of Appeals erred to hold otherwise. Adopting a notion of fit that is so strict as to require an expert to address every foreseeable issue pertinent to his testimony that might be raised by the relevant facts goes beyond the requirement that the testimony be helpful and therefore relevant under Rule 702. The question under Rule 702 is not whether there are *some* facts in the case that the expert failed to take into account, but whether the expert's testimony took into account *enough* of the pertinent facts to be of assistance to the trier of fact on a fact in issue. That some facts were not taken into account by the expert is a matter of weight and credibility, not admissibility.

*Jordan,* 928 S.W.2d at 555–556. (emphasis in original)

In the instant case, recall that there were two witnesses who testified to having seen appellant at or near the scene of the murder on the morning of December 12, 1988. Witness N.R., a neighbor of the victim's girlfriend, was twelve years old at the time of the offense and testified that, after having run out on her front porch to see if her

4. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

school bus had passed, she observed a man in the garage directly across the street from her house. The man was facing away and crouched next to the victim's vehicle. She only viewed this scene for about three seconds. Approximately two days later, N.R. was shown a photograph of a group of men in a hunting party. About three weeks later, N.R. was shown a photo line-up of six different faces compiled by the authorities from book-in photographs. Only the appellant appeared in both photographs. N.R. could not identify anyone from either photograph. Then on March 20, 1989, N.R. attended a live line-up at the Montgomery County Sheriff's Office. At the live line-up, N.R. identified appellant as the man she saw crouching in the garage of the victim's girlfriend on December 12, 1988.

Similarly, witness B.M. testified to having seen a man walking up her driveway at approximately 7:15 a.m. on December 12, 1988. B.M. testified that her house was situated behind the house that N.R. lived in. B.M. testified that she observed the man anywhere from four to ten seconds. Like N.R., B.M. viewed, on two separate occasions, the hunting photograph and the photo line-up. B.M., however, identified appellant from these photographs as the man she saw walking up her driveway on the morning in question. B.M.'s testimony indicated that she had also seen a newspaper photograph of appellant. B.M. also attended the live line-up at the sheriff's office and was able to identify appellant at that time. B.M.'s identity testimony at trial was unshakable.

Appellant was permitted to have Dr. Deffenbacher testify as part of appellant's bill of exceptions. Regarding relevancy, the record reflects that prior to testifying, Dr. Deffenbacher had the opportunity to talk with defense counsel concerning the facts and circumstances of the case; had the opportunity to review copies of the prior testimony and statements of both N.R. and B.M.; was permitted to remain in the courtroom when N.R. and B.M. testified with regard to the events surrounding their identification of appellant; had the opportunity to view the photographs used by the authorities with both N.R. and B.M. in the identification process; and had the opportunity to view other related photographic evidence of the areas in which appellant was allegedly observed by both N.R. and B.M. Based upon these facts, we find that Dr. Deffenbacher's expert opinion testimony, which we will detail later under our analysis of the "reliability" prong, takes into account "enough" of the pertinent facts to be of assistance to the trier of fact on the critical fact issue of identity of the perpetrator of the murder. *Jordan,* 928 S.W.2d at 556. Dr. Deffenbacher's testimony satisfies the "relevancy" prong of Rule 702.

With regard to the "reliability" prong of Rule 702, we find the following language in *Jordan* to be particularly instructive:

> [R]eliability depends upon whether the evidence has its basis in sound scientific methodology. This demands a certain technical showing. Accordingly, it is upon the reliability inquiry that trial courts can weed out testimony pertaining to so-called "junk science." (citation omitted) It is largely to this end that trial judges are called upon to serve as "gatekeepers." *Daubert,* supra. While "junk science" or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case and to that extent be of assistance to the jury, it will not have a sufficiently sound scientific basis to be reliable.

*Id.* at 555.

In its latest pronouncement on the issue, the Court of Criminal Appeals in *Hartman v. State,* 946 S.W.2d 60, 62 (Tex. Crim.App.1997), held that *Kelly* did not limit the two-pronged standard to "novel" scientific evidence. The *Hartman* Court reiterated the *Kelly* criteria for reliability: 1) the underlying scientific theory must be valid; 2) the technique applying the theory must be valid; and 3) the technique must have been properly applied on the occasion in question. *Id.* Some non-exclusive factors that could affect a trial court's determination of reliability include: 1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; 2) the qualifications of the expert(s) testifying; 3) the existence of litera-

ture supporting or rejecting the underlying scientific theory and technique; 4) the potential rate of error of the technique; 5) the availability of other experts to test and evaluate the technique; 6) the clarity with which the underlying scientific theory and technique can be explained to the court; and 7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly,* 824 S.W.2d at 573.

We now turn to a somewhat lengthy recital of Dr. Deffenbacher's testimony elicited during the hearing out of the jury's presence. Initially, Dr. Deffenbacher stated that he was chairman of the psychology department of the University of Nebraska at Omaha, and had held that position since 1980. As chairman of the department, half of his time is taken up with administrative duties, one quarter with teaching, and one quarter with conducting research experiments and "publish[ing] the results if they are deemed to be worthy by peers in the scientific community." We continue with pertinent portions of the testimony of Dr. Deffenbacher as it appears in the record:

Q. [Defense Counsel] Do you have any particular area or interest of research?

A. [Deffenbacher] Within the area of concern for human perception and memory, I have been specifically concerned over the years more narrowly in how visual perception works. There are five senses. I have been particularly interested in the visual system, how we perceive with the aid of our eyes and visual brain. And I have been interested in how the brain puts into storage, maintains in storage and retrieves information that has been obtained through the visual system.

Q. Have you written any papers, books or other publications?

A. Yes.

Q. Could you tell the Court roughly how many?

A. Well, on the areas, particular areas of perception, visual perception and memory that I have mentioned, I would say over the time period since 1968, about 35 articles, 10 or 12 chapters in edited books and a textbook on perception.

Q. Have you received any significant honors or awards for your work in research in this area?

A. Yes. I consider it an honor to have been selected for the editorial board of the Journal of Applied Psychology. This is a journal of the American Psychological Association and it is the leading journal in the world for publishing the results of applied psychological research, including applied studies having to do with human perception and memory. Particularly in the area of the psychology of testimony.

Q. Doctor, how long have you been interested in this particular specific field of psychology?

A. Which, psychology generally or the specific one I just mentioned, the psychology of testimony?

Q. Specifically with regards to testimony.

A. Since about 1973, I believe it was.

Q. And can you tell the Court what type of research that you have done particularly specifically in this field?

A. There are probably 10 or 15 different variables or factors that researchers in the field have identified as affecting the behavior, the performance of human eyewitnesses. And I'm certainly familiar with the studies of others on a number of these, but I have personally done research concerned with perhaps four of these variables.

Q. Are there specific variables that can, at least according to your research, alter or vary the reliability of eyewitness identification?

A. Yes.

Q. And what are some of those variables that you have learned can definitely have an effect upon the credibility of eyewitness identification?

A. As I say, I have learned through my own work and that of others about 10 or 15 of these. Do you want me to talk about the ones I have personally been involved in researching?

Q. Yes, sir.

A. One of these has to do with the effects of what's known as photo biased line-ups. The effects of—in other words, what sorts

of stimuli that a person might encounter after their initial encounter with a stranger, what sorts of events that they might encounter after that might possibly have a bearing on their memory and their future reports about that memory. And one not uncommon sort of post-situation kind of bias is called the photo biased line-up.

Q. What do you mean by cognitive psychology?

A. Cognitive these days is taken by people in psychology to refer to—it's pretty much become a label for all activities of the normal human mind, perception, memory, making of decisions and judgments, thinking, solving problems, all of these activities.

Q. And are these studies that have been conducted by you and the results accepted generally in the scientific world as, you know, valid conclusions, valid tests?

A. Yes, insofar as scientific conclusions are ever accepted as being valid within any period of time.

. . . .

Q. Can you tell the Court what type of information or criteria that you looked at in order to be able to come to conclusions or—with regards to the validity of any specific eyewitness testimony?

A. In every case I examined police reports, depositions, pretrial hearing testimony, any sort of photos, of photo spreads, line-ups, any evidence that a particular side of the case thinks would be relevant for me to see.

Q. The tests and experiments that you have conducted and that have been conducted by your fellow scientists in connection with this particular area of eyewitness identification, is this something that the ordinary individual, the ordinary layman would have knowledge or have any understanding?

A. Some knowledge and understanding, but we have discovered, as cognitive psychologists have discovered in general about the human mind, that in many cases our common sense intuitions and theories about how the mind operates are only first approximation. There is a lot of, a lot of details and sometimes some real surprises about how the mind works that scientists didn't know about going in.

And in some cases common sense explanations of why we—of how the mind works or of how a person thinks their mind works just isn't true at all. And that's always both baffling and exciting at the same time when you discover something you thought was true because your intuition or common sense has told you that and it turns out not to be true.

And science always requires that you find—you always replicate findings and particularly if they are not ones that you expected to find. And if they had continue [sic] to turn up, especially if other scientists have found the same thing, then you begin to believe maybe there's maybe things are not quite the way you thought.

Q. Do you think that if, say, I was in a position to have to make a judgment call regarding eyewitness identification that the knowledge that you have gained out of your expertise and your research and the research of your colleagues could be helpful to be [sic] me in determining whether or not I felt that the eyewitness identification might be credible or might not be credible?

A. Yes. I think such information could be helpful.

Q. Why?

A. If you, a layperson, is [sic] going to make a judgment about the credibility of an eyewitness to an event, you presumably have certain assumptions and intuitions about how that person works, how their mind works based on how you think your own does. And as long as those intuitions are relevant and accurate, then there's no problem. But if they aren't or if they're at least partially true, but there is a lot of—there's important information as to what limits your assumptions about how the human mind works are true, then it seems to me you can quite possibly come to an erroneous conclusion if you don't have all the information you need to try to make this probabilistic kind of judgment as to whether or not someone else has made an accurate identification.

Q. Doctor, would it be a fair statement to say that the findings and conclusions that you have come to as a result of your studies and review of the studies of your colleagues have resulted in some very sound scientific principles?

A. Yes.

Q. I believe I already asked you if this type of work, this type of research and findings of this type of research are recognized in the scientific community as being sound scientific principles and having sound scientific basis?

A. Yes, they are.

Q. Now, prior to coming forward to offer your testimony before this jury today, have you had an opportunity to talk with both [Defense Co-counsel] and myself concerning some of the factors that are involved in this particular case?

A. Yes.

Q. And have you had an opportunity—did we furnish you with copies of the prior statements of [B.M.] and [N.R.] for you to review?

A. Yes.

Q. And have you had an opportunity to review those statements?

A. Yes.

Q. Of course, you were seated in the courtroom earlier this morning when both of these two ladies were called back to the stand to complete their testimony concerning their eyewitness identification in this case?

A. Yes.

Q. In addition to having had an opportunity to review testimony and to hear some of their testimony live, have you also had an opportunity to review other evidence in this case, specifically photographs of the area where this identification supposedly took place?

A. Yes.

Q. Have you had an opportunity to review that?

A. Yes.

Q. And also to view pictures that were utilized by law enforcement in connection with their efforts to try and obtain an identification of the individual involved in this instance?

A. Yes.

Q. And I believe in that connection you saw photographs of the police line-up; is that right?

A. Yes.

Q. And photographs of—or what was commonly referred to as a photo spread?

A. Yes.

Q. And also I think there was a photograph involving some hunters?

A. Yes.

Q. Now, and you have heard testimony and you were able to determine from your own visual observation that these three photographs had one specific individual in common; is that correct?

A. Yes.

Q. Is that factor alone a significant factor in your analysis as to the viability or reliability of eyewitness identification?

A. Yes.

. . . .

Q. I believe you said earlier that there was something like seven specific areas involved, one of which was photo bias?

A. I believe I said there were on the order to [sic] 10 to 15 variables.

Q. Ten to fifteen?

A. Yes, sir.

Q. And I asked you if there were any of those variables that after having examined some of the evidence and having heard the testimony, if there were any of those variables that you felt applied specifically to this case and you mentioned photo bias?

A. 9 [sic] Yes. And there are a couple of others.

Q. What other variables are there that, in your opinion, apply to this specific case?

A. One could be as simply as forgetting the unfamiliar face and the other has to do with just how strong the relationship is between the perceived confidence of an eyewitness and their accuracy.

. . . .

Q. What do these variables do or what effect do they have upon the credibility of eyewitness identification?

A. Well, the whole point of eyewitness identification is to try to establish the identity of a particular individual and to link them with a particular set of circumstances and time and space. What that depends on in the case of an eyewitness or in your—for that matter human memory. The original situation is over and gone. You then have to be concerned about the fidelity or faithfulness of human memory. That's the most important factor.

But one thing—well, one of the variables I mentioned is forgetting. We all have common sense intuitions about forgetting and these are approximately true. The strength of a trace or a representation in our brain of whatever circumstances we have been exposed to rarely gets stronger over time and it ordinarily over time and circumstances gets weaker.

And what cognitive psychologists have been able to do is look at just how fast, depending on time and circumstances, that memory representation gets weaker so that depending on the circumstances, in tightly controlled circumstances we have more precise estimates of just how strong the memory representation on average might be after a certain amount of time and depending on certain other factors.

That is where I think the layperson, they're right, if you ask most laypersons, and studies have done this, they will agree that memory gets worse over time, memory traces get weaker. What is not always—in fact, frequently isn't clear to the layperson is just how fast they get weaker over time. And that is where cognitive psychologists with the aid of mathematics and a lot of research on live human subjects are able to provide some more specificity as to how strong a memory representation might be in hours, days, weeks after a person's been exposed to a situation.

Q. Can you give the Court an example of what you are talking about?

A. Well, we often do in this area what is called recognition memory studies. That's essentially what a person does when they ask to—if they can make an identification from a photo spread or from a photo line-up or a live line-up, what they are being asked to do is, first of all, to use human recognition memory. I mean, they first have to decide are any of these individuals someone I have seen before. And as it turns out we human beings do relatively well at being able to recognize someone if—even if they are unfamiliar, if we have gotten a good look at them. At least for a short period of time we are. If they are a total stranger and we have gotten a really good look at them, whether that might be five, ten, fifteen seconds unhurried careful look, they might be able to show reasonably high accuracy if you have tested their memory with a set of photos that includes the photo or photos they have seen and others. If they haven't, you ask them if they can pick out the ones or you expose each photo to them and yes or no, did you see this before. They can show fairly high accuracy if you test their memory in minutes or a few hours afterwards.

It would not be uncommon when you test recognition memory for one or two individuals that someone is seen in a more real life scenario. Many researchers in this field stage what are called simulated crimes where they are using actors, videotape a scenario of some sort that involves a simulated crime of some sort and then the eyewitnesses, as so-called in the studies, are asked to view these and then are later asked questions about what they saw. And in particular they are usually shown photo line-ups or live line-ups.

And so what they are asked to do, is this someone I saw previously, any particular photo in a photo spread or any particular person in a line-up. But what is more important is this person I saw in that particular scenario. And to a somewhat surprising conclusion, what I first discovered in my own work is they're rather much better at recognizing that we have encountered somebody before. We're way better at that then [sic] we are at being able to pin down just where and when we saw them. Our memory for context, for cir-

cumstances of encounter of other individuals is rather more poor.

Cognitive psychologists these days refer to that as memory for source. All of us show in our daily living a lot of confusion about the source for where we have seen something, where we have read something, where we have heard something.

. . . .

Q. Okay. And I believe you also, when you were talking to me, mentioned something about the relationship of eyewitness confidence to eyewitness accuracy?

A. Yes. This was a somewhat surprising finding. I don't think I was the first to find it, but there was one previous finding out there. The finding I am referring to is a somewhat counter-intuitive one. We all have the common sense intuition that the more confident that somebody appears to be, the more likely they are accurate in what they are representing to us. The less confident they appear to be, the less accurate they are.

That had been my assumption prior to conducting a study that was published in 1977. And it isn't—this particular finding is not one we set out to find, but we had the data. We not only asked people are—is—are each of these people in these photographs or in this live line-up, are they the person that you saw in a particular situation or doing a particular thing. And we also asked them on a five-point rating scale how confident are you when they made their decision, yes or no. And we decided we had this information so we would just check to see how closely the ratings, their own ratings of how confident they felt, how well those related or correlated with their accuracy.

And we were somewhat startled to find out in several different calculations we did in this series of studies that the relationship was virtually zero, that is, given the one piece of information confidence, the subjective ratings that they made of their confidence, an observer could not use that information to predict at all the actual accuracy. In other words, a highly confident person could just as easily be inaccurate. A low confidence, a person who did not feel very confident could just as likely be making the correct decision in each case.

. . . .

Q. One other area that we have touched on just briefly a few minutes ago and that is a variable that you have labeled, called photo bias; is that correct?

A. Yes.

Q. And, in your opinion, having reviewed this testimony and seen the pictures and so forth that have been admitted into evidence, is this a variable that you feel would be significant in this particular case?

A. Yes.

Q. I may have asked you this before, if I did, forgive me for repeating it, but would you tell the Judge just a little short summary or synopsis of what photo biases is as you view it or as you use it in connection with your research?

A. Well, this is the situation where an eyewitness confronts some kind of situation that involves them encountering a stranger and sometime later prior to them viewing any sort of life [sic] line-up or photo line-up, they are exposed to one or more photographs that also include the presence of an image of a person who later turns out to be a suspect and at that time or at those times, they don't make a positive identification, but later at a line-up they do make a positive identification of the suspect who turns out to have been in one or more previous photo viewings. Sometimes these can be photo spreads and/or they may be a picture somebody saw in the paper, on TV or whatever. But these represent additional encounterings of an image of a person in different circumstances than the presumably original circumstances.

Q. And the fact that an individual is shown two or more photographs in which the only individual, there's only one individual that is in each one of those photographs, the more photographs they are shown where that one individual is the only similar one in there, does that increase their likelihood of fixing upon a particular face and then identifying it based primarily

upon their recognition of prior faces or of a face in a prior photograph?

A. Yes. And it is particularly—something else other colleagues and myself have discovered. It turns out to be more of a problem when the viewing conditions weren't so good or if the witness got only a brief glimpse of whoever the stranger might have been.

Q. And is there a difference between eyewitness identification of someone that the individual previously knew and the eyewitness identification of one I believe you have named as—called as a stranger?

A. Yes.

Q. The principles that we have been discussing the last 15 or 20 minutes and the findings that have resulted from your scientific studies and review of other scientific data, do you feel that they apply to the specific facts of this case?

A. Yes.

Q. Would you tell us how they apply to the facts of this case?

A. Taking each of those three factors I *mentioned?*

Q. Yes.

A. Well, starting with the forgetting of a stranger's face, as I have been given to understand the facts in this case, the time between the ultimate memory test and that—and the original exposure to the incident or the circumstances of their encountering, of the witness encountering the stranger was, I understand, on the order of 12 to 13 weeks. And our studies and those of others show that if one has, let's say, a five to ten-second glimpse of a stranger, that on average, it depends on how distinctive the face is and there are some individual differences in how good—we don't understand how they exist, but there are some individual differences on how good people are at recognition memory of stranger faces.

Bud [sic] in general the degree of strength of a person's memory representation after around 90 days or three months could easily been down to maybe 30 percent accuracy. That would not be uncommon. If—clearly, I mean that is based on my best judgment averaging across a lot of studies. If somebody looked like the Hunchback of Notre Dame, clearly most individuals would still be doing pretty well at picking them out of a line-up after three months.

But barring having a very distinctive sort of face, the degree of memory representation after that period of time—there are a number of other sources of bias in the situation, it would be such that in situations where we know who they were exposed to, we could do that in the laboratory in simulated studies and field studies, the memory representation would be such that the accuracy of a person at picking somebody out of a six or seven person line-up could be as low as 30 percent after that period of time.

Q. There was one other area you said applied in this specific case?

A. Well, two. One was the operation of photo biasing of line-ups and I guess I talked about that quite a bit already, unless you wanted me to—

Q. How does it apply specifically to this case?

A. Well, you have the circumstances of eyewitnesses getting a brief look at the face of a stranger or no look at the face of a stranger and then subsequently days or a few weeks later they are shown two different—well, two different sets of photographic images that both contain the image of the suspect. And then I believe in the case of one witness whose testimony I heard this morning that witness apparently was exposed to a newspaper photo as well which included the image also of the suspect.

So what we have here then are two or three subsequent encounters with, presumably under good viewing circumstances when you get to look at the photograph of the image or the suspect. So the question then becomes can an eyewitness base their identification only on the image of the face of the stranger they saw at the scene of the crime or is their memory based wholly or in part on the subsequent images they have seen.

And from what cognitive psychologists knows [sic] about human memory, it especially—when the glimpse wasn't that long or the viewing circumstances weren't that good, the possibility of photo bias becomes stronger and there is no way for the individual involved or for any of us to know for certain how much the identification would be based on the subsequent images. And I don't think any individual, none of us in those circumstances would know either.

Photo biasing is largely an unconscious phenomenon. We don't know it is taking place and we don't have conscious insight into it. So that an individual, an eyewitness in those circumstances could be perfectly sincere that their identification is based on their memory image of the person, the stranger they encounter, but cognitive—one thing cognitive psychologists know is that the human mind is not like a videotape recorder with nice little sections on the tape faithfully recording each little certain set of circumstances we encounter.

And in particular we can't store information about the context in which we view things or hear things in watertight compartments. It gets all smeared together. And that's probably why we have so much difficulty with source memory. Individuals often say, you know, I know that face, but I can't retrieve the name or I can't remember where I saw them.

And the point there is, again, the fact has been confirmed scientifically a recognition memory feeling of familiarity that if we have encountered somebody somewhere before is often relatively good, but our ability to pin down just when and where is a lot less accurate.

Q. The third area, the third variable you mentioned a little earlier that you felt would apply to this case, I believe you called it eyewitness confidence to eyewitness accuracy?

A. Yes.

Q. And how would that variable apply to the specific facts of this case?

A. Well, given, as I mentioned earlier, that it is common sense intuition that highly confident people ought to be accurate and less confident people are less likely to be accurate, the assumption of most laypersons including triers of fact would be that that is what is operating in the case of human eyewitness is [sic].

And indeed studies have shown that people with and without jury experience, attorneys, judges, believe that to be the case. And studies that have shown where—you have studies of mock jurors, people that are asked to view a videotape or actors doing a real courtroom case that's been scripted, when they are asked to make—when they see direct and cross-examination of witnesses to a particular set of circumstances where we know what happened, the one—and where psychologists have manipulated some of these variables, those 10 or 15 that I had mentioned, they put them into the case, some in and some not, all those variable [sic] have been shown to affect the reliability of eyewitness testimony. Practically the only one that mock jurors pay any attention to is the perceived confidence of the eyewitness who's testifying.

So, and when you think about it, most people who would testify as eyewitnesses are at least moderately confident. They aren't likely to be testifying except in unusual circumstances if they aren't. And what tends to happen over time is as a person goes over their memory for an event, as they tell others about it, they get more confident, and sometimes more confident for reasons that have little to do with accuracy.

Meanwhile, the memory representation that is the only basis for an eyewitness' accuracy of report, that never gets stronger and generally over time and circumstances gets weaker. So what you have is individuals who are moderate to highly confident and that may increase over time for reasons unrelated to accuracy and you have accuracy going the other way. And in that way confidence, an eyewitness' confidence and their actual accuracy can kind of get unhinged or unhooked and that may explain why confidence is typically not all that highly related to actual accuracy.

Q. These results that you have—conclusions you have reached as a result of the

experiments and so forth that you have conducted, so forth, are the results of these experiments in your opinion reliable?

A. Yes. Insofar as science—a body of scientific studies can be reliable.

Q. You say these are generally accepted in the scientific community as being reliable; is that correct?

A. Yes.

On cross-examination, the State's attempt to debunk Dr. Deffenbacher's opinions was met in the following manner:

Q.[The State] But the person who knows best whether they are influenced by the photographs is the person that's seen the photographs and the person that's seen the man, wouldn't you agree with that?

A.[Deffenbacher] No. Because as I said this is largely an unconscious sort of process. You may not be aware that—and typically I expect people aren't aware that that's happened.

Q. So if someone said I know I saw the photographs, but I know that I'm not influenced by them, they would just be wrong, wouldn't they?

A. They might be sincere, but they would be wrong if they weren't influenced at all.

. . . .

Q. And you know all the circumstances surrounding the person's seeing photographs before the later identification and you know all of those circumstances surrounding the other identification. Knowing all of that, though, and from your studies you still don't know—you still can't quantify a probability that the person is influenced by photo bias to where they are misidentifying someone?

A. What studies—what studies have shown is that the probability of a misidentification increases. That's a general statement. Usually what's been shown is—in a particular study the probability of errors increase in a statistical significant sense, which means it is not just chance kind of increases. So we can't—in general we can't—it would be difficult to predict precisely just how much increase in error there might be.

One thing we do know, though, studies have shown, is the effects of photo bias are less likely to be a problem when the viewing circumstances are quite optimal. It's definitely more of a problem when the viewing circumstances are not so good. So we do know that. And so we know generally—we know about the direction of the effect and it's going to be more sizable in the case where the viewing circumstances weren't good, less sizable in a case where they are more reasonably optimal.

In addition to the above testimony, appellant included in his bill of exceptions articles taken from a variety of publications describing scientifically-conducted experiments and the results of said experiments; all related to the accuracy of eyewitness identification. For example, Defendant's Exhibit 53 is a copy of an article entitled, *Disputed Eyewitness Identifications: Can Experts Help?* Said article was written by John C. Brigham, who is described at the bottom of the first page of the article as follows:

> John C. Brigham is a Professor of Psychology at Florida State University. He has published over 30 research articles on eyewitness evidence and has testified as an expert witness on factors affecting the accuracy of eyewitnesses.

The gist of Professor Brigham's article, citing research findings, supports Dr. Deffenbacher's expert opinion regarding eyewitness identification accuracy.

Defendant's Exhibit 54 is another article taken from the August 1989 issue of AMERICAN PSYCHOLOGIST, a publication of the American Psychological Association, Inc. It is entitled, *The "General Acceptance" of Psychological Research on Eyewitness Testimony, A Survey of the Experts.* The article is jointly authored by Saul M. Kassin of Williams College, Phoebe C. Ellsworth of the University of Michigan, and Vicki L. Smith of Northwestern University. An abstract of the article appears on the first page and provides the following:

> Sixty-three experts on eyewitness testimony were surveyed about their courtroom experiences and opinions on various issues. There was a strong consensus indicated by an agreement rate of at least

80% that the data on the following topics are reliable enough to present in court: the wording of questions, lineup instructions, misleading postevent information, the accuracy-confidence correlation, attitudes and expectations, exposure time, unconscious transference, showups, and the forgetting curve. Over 70% of the experts also endorsed lineup fairness, the cross-race identification bias among White witnesses, and the tendency to overestimate the duration of events. Although most eyewitness experts who have testified have done so on behalf of criminal defendants, they were just as likely to consent for the prosecution as for the defense; moreover, they were more likely to agree to testify in civil cases than in criminal. Concerning their role in court, most respondents indicated that their main objective is to educate the jury, and that juries are more competent with the aid of experts than without. The results are discussed in relation to the "general acceptance" provision of the *Frye* test and the limitations of this test for determining the admissibility of expert testimony.

While the names of the sixty-three experts were not listed, a study conducted and reported by Dr. Deffenbacher in 1982 was cited several times in the article.

Defendant's Exhibits 55, 56, and 57 are all articles authored or co-authored by Dr. Deffenbacher. Defendant's Exhibit 55 is entitled, *Updating the Scientific Validity of Three Key Estimator Variables in Eyewitness Testimony.* It appears to be an update, based upon new research, on the Kassin, Ellsworth, and Smith article discussed above. Defendant's Exhibit 56 was published in 1991 in APPLIED COGNITIVE PSYCHOLOGY, and is entitled, *A Maturing of Research on the Behaviour of Eyewitnesses.* The accompanying summary describes the article as follows:

More than a decade of sustained, vigorous research has resulted in an applied cognitive psychology of eyewitness behaviour that is a rapidly maturing body of knowledge. Several developments now would permit police forces to increase the sensitivity, reliability, and fairness of eyewitness memory retrieval. The juror's task of estimating the effects of certain variables on the accuracy of eyewitness report can now be a much more informed one, the relevant research literature now being relatively clear and consistent. Across studies the effect size of a number of these variables is moderate or greater. Equally important has been the consistent failure to document several results that would be predicted from the common-sense intuition of juror and jurist alike.

Finally, Defendant's Exhibit 57 is a 1977 article published in JOURNAL OF APPLIED PSYCHOLOGY, and entitled, *Memory for Faces and the Circumstances of Encounter.* Again we provide the following synopsis contained on the first page of the article:

Three experiments examined the possibility that eyewitness identifications may be biased because persons may be much better able to recognize a face than to recall where they saw it. In Experiment 1, 14 college-student subjects were asked both to recognize 50 facial photographs seen 2 days before and to recall in which of two distinctive rooms they had been seen. Strong recognition and minimal recall were found. Experiments 2 (64 college-student subjects) and 3 (146 college-student subjects) modeled more closely the usual criminal identification situation with mugshot and lineup sessions occurring after the initial encounter with the suspects. Subjects in Experiment 2 were aware they would need to remember the subjects' faces; in Experiment 3, they were not aware of this need. Both experiments provided evidence of considerable confusion in mugshot and lineup identifications as well as a lack of correlation between eyewitness accuracy and confidence. In addition, there were strong mugshot-induced biases in Experiment 3 that could have a bearing on questions of legal procedure and the admissibility of evidence.

The testimony of Dr. Deffenbacher taken together with the scientific articles lead us to conclude that appellant proved, by clear and convincing evidence, the reliability prong of *Daubert* and *Kelly.* The evidence taken together provides adequate validation of the

scientific theories in question. The experiments discussed in the articles involved valid and generally acceptable scientific techniques. This provided a reliable basis for Dr. Deffenbacher's opinion that photo bias, more often than not, results in inaccurate "eyewitness" identification, and for his opinion that the confidence level of "eyewitness" identification of strangers is wholly unrelated to the accuracy of such identification when the stranger is viewed for a very short period of time.

In our examination of the cases dealing with Rule 702, we find guidance on the issue of expert opinion testimony in the following two observations taken from *Daubert:*

> Nothing in the text of this Rule [702] establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of Frye, and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony."

*Daubert,* 509 U.S. at 588, 113 S.Ct. at 2794, 125 L.Ed.2d at 480.

"The inquiry envisioned by Rule 702 is, we emphasize, *a flexible one.*" *Id.,* 509 U.S. at 594–595, 113 S.Ct. at 2797–2798, 125 L.Ed.2d at 483–484. (emphasis supplied)

In the instant case, we find the expert opinion evidence proffered by appellant through Dr. Deffenbacher to be sufficient to satisfy the requirements of Rule 702 as interpreted by the Court in *Kelly, Jordan,* and *Daubert.* The trial court abused its discretion in refusing to admit said evidence before the jury.

On September 1, 1997, a revision of the Texas Rules of Appellate Procedure went into effect. By order of the Court of Criminal Appeals, the revised rules are to govern all appeals then pending, unless said order provides otherwise. As such, appellate review for reversible error is now controlled by Tex.R.App. P. 44.2. *See also King v. State,* 953 S.W.2d 266 (Tex.Crim.App.1997). In the instant case, as we are faced with non-constitutional trial error, our focus is on Rule 44.2(b) which reads as follows:

> (b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

The "Notes and Comments" to Rule 44 indicate that paragraph 44.2(b) "is new and is taken from Federal Rule of Criminal Procedure 52(a) without substantive change." We will therefore avail ourselves liberally of federal precedent on the issue.

In *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court discussed, at some length, its observations on the "harmless error" rule, which also took into account a violation of the defendant's "substantial rights," in the overall function of appellate review of trial error. The following provides some guidance:

> But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. (citation omitted) In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

*Id.* at 764, 66 S.Ct. at 1247–1248, 90 L.Ed. at 1566.

Relying to a significant extent on the discussion in *Kotteakos,* the Court engaged in an updated discussion of the "harmless error rule" in *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Writing for the Court, Chief Justice Burger noted that the *Kotteakos* Court emphasized that the "clear intent of Congress was simple:

To substitute judgment for automatic application of rules." *Id.* at 448, 106 S.Ct. at 731, 88 L.Ed.2d at 824–825. Burger further analyzed *Kotteakos:*

> "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations." [*Kotteakos,* 328 U.S.], at 762[, 66 S.Ct. at 1246, 90 L.Ed. at 1565]. The Court flatly rejected per se rules regarding particular errors because "any attempt to create a generalized presumption to apply in all cases would be contrary not only to the spirit of [the statute] but also to the expressed intent of its legislative sponsors." Id., at 765[, 66 S.Ct. at 1248, 90 L Ed at 1567].

*Lane,* 474 U.S. at 448, 106 S.Ct. at 731, 88 L.Ed.2d at 825. Based upon his examination of *Kotteakos*, Burger fashioned the *Lane* holding as follows:

> Under Rule 52(a), the harmless-error rule focuses on whether the error "affect[ed] substantial rights." In Kotteakos the Court construed a harmless-error statute with similar language, and observed:
>
> "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S., at 765[, 66 S.Ct. at 1248, 90 L.Ed. at 1567].

*Lane,* 474 U.S. at 449, 106 S.Ct. at 725, 88 L.Ed.2d at 825.

Significantly, the *Lane* Court went on to find that "[i]n the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was harmless." *Id.* at 450, 106 S.Ct. at 732, 88 L.Ed.2d at 826. Therefore, while "the inquiry cannot be merely whether there was enough [incriminating evidence] to support the result," the amount and nature of the evidence pointing to the defendant's guilt is a meaningful part of the "harmless error" analysis for an appellate court.

Prior to our concluding discussion applying the law to the error in the instant case, we must point out what we feel is an anomaly regarding Rule 44.2(b). Its plain language, and the plain language of its almost identical federal counterpart, FED.R.CRIM.P. 52(a), appears to mandate that when we find "other error" that does not affect substantial rights, we are to disregard such error. Therefore, once trial error is found, must not a two-step process take place? Step one would seem to require the reviewing court to initially determine if the trial error affected the defendant's "substantial rights." If that resulted in an affirmative finding, *only then* would the reviewing court move on to the second step, a determination of whether the error was reversible. Neither Rule 44.2(b) nor Rule 52(a) plainly states, or even remotely hints, that a finding that a defendant's "substantial rights" have been affected by the error *equates* to reversible error. The *Kotteakos* and *Lane* cases do not aid us in a resolution of this dilemma. The *Lane* Court held that, based on the "Kotteakos test," error involving misjoinder affected the defendant's substantial rights "and requires reversal only if the misjoinder results in actual prejudice" involving "substantial and injurious effect or influence in determining the jury's verdict." *Lane,* 474 U.S. at 449, 106 S.Ct. at 732, 88 L.Ed.2d at 826. As noted above, the *Lane* Court *then* went on to find the error harmless "in the face of overwhelming evidence of guilt." It would appear, based upon *Lane,* that the lion's share of the analysis of a trial record by a reviewing court is to answer the "substantial rights" question. Should that question be answered favorably to the defendant, a second inquiry, again based upon *Lane,* seems to merely focus on whether or not overwhelming evidence of guilt exists in the record. As this appears to be the procedure utilized by the court in *Lane,* we will attempt to fashion a practical version of it for use on appellate review until we are provided with guidance from the Court of Criminal Appeals.

In our approach to the *Kotteakos/Lane* discussions of whether or not trial error has affected a defendant's substantial rights to such an extent that reversal of the conviction is required, we find a proper re-

view of Rule 44.2(b) error requires the appellate court to consider the entire record on its own merits and in its own unique setting, *and*, placing the error in the context of said record, determine whether any substantial rights of the defendant have been affected. If the substantial rights of the defendant have been affected, the appellate court must next inquire, after considering the error's impact on the defendant's substantial rights, whether we are left with "grave doubt" as to whether the error did have or could have had substantial and injurious effect or influence in determining the verdict. If the appellate court has such doubt, in the absence of overwhelming evidence of the defendant's guilt, the conviction must be reversed.

In the instant case, with the exception of the eyewitness testimony of N.R. and B.M. placing appellant at or very near the scene of the crime at or near the time that it occurred, the State's case against appellant was entirely circumstantial. Appellant presented a strong and quite plausible defense which included some credible testimony that, if believed, would have made significant portions of the State's case involving appellant's physical presence at incriminating locations logistically impossible. Put another way, an examination of the very lengthy record in this case does not lead to the conclusion that it contains overwhelming evidence of appellant's guilt. The erroneous refusal to permit Dr. Deffenbacher's evidence, which would have called into question the accuracy of the State's only *direct*, as opposed to circumstantial, witnesses, in the light of the entire record before us, affected appellant's substantial rights to the extent that had the evidence in question been admitted, it could have had a substantial influence on the jury. Appellant's conviction, therefore, must be reversed.

We sustain appellant's third point of error. The judgment of the trial court is reversed, and the cause remanded to said court for a new trial on the merits.

REVERSED AND REMANDED.

STOVER, Justice, concurring and dissenting.

Though I respectfully acknowledge the current position of the Court of Criminal Appeals,[1] which the majority in this case purports to follow, I write nonetheless to express my disagreement with the conclusion that the trial court erred in excluding the testimony of expert witness, Dr. Kenneth Deffenbacher, on the issue of eyewitness reliability. In my view, the credibility of the lay witnesses (N.R. and B.M.) is a matter which should be left to the jury. The jury remains the "exclusive judge of the facts proved, and of the weight to be given to the testimony...." *See* Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 1979).

Appellant's use of Dr. Deffenbacher's testimony was merely an attempt to attack the credibility of the two eyewitnesses through the use of expert testimony. That attack is properly left to defense counsel in his cross-examination of each witness. During cross examination, the appellant touched on the issue of the length of time that elapsed between the eyewitnesses' initial encounter with the suspect and their subsequent identification of him. The appellant also elicited on cross-examination the fact that the three identification formats—the photo spread, the photograph of the hunters, and the lineup—all had one individual in common, that being the defendant. Once given that information, the jury was capable of understanding the import of it. The testimony of an expert witness is not required to develop the prejudicial effect of that circumstance and the effect it might have had on the reliability of the identification. Furthermore, the notion that an unfamiliar face may be more easily forgotten than that of a familiar one, or the notion that a person is able to remember having *seen* a particular face more readily than *where* he encountered that face, are likewise not concepts on which a jury needs expert opinion or assistance. In addition, the idea that a highly confident person could just as easily be inaccurate and a person of low confidence be correct in identification of

1. See *Jordan v. State*, 928 S.W.2d 550 (Tex.Crim.App.1996); *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992).

a perpetrator, is likewise not a theory which the jury needs assistance in understanding. In that sense, I do not agree that the expert testimony in this case is relevant—a position that has not won favor with the Court of Criminal Appeals.

I further disagree with the majority in their conclusion that Dr. Deffenbacher's testimony satisfies the second prong of the test set out in *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App.1992). His testimony in this case does not prove the scientific reliability of the offered scientific evidence by clear and convincing evidence; specifically, the proffered testimony does not show the "potential rate of error of the technique." *Id.* at 573. In speaking of the potential rate of error in eyewitness identification, Dr. Deffenbacher stated it was "difficult to predict precisely just how much increase in error there might be." In answer to the State's question regarding the quantifying of the probability, Dr. Deffenbacher's response is telling in both its generality and ambiguity.

Q. [The State] And you know all the circumstances surrounding the person's seeing photographs before the later identification and you know all of those circumstances surrounding the other identification. Knowing all of that, though, and from your studies you still don't know—you still can't quantify a probability that the person is influenced by photo bias to where they are misidentifying someone?

A. [Dr. Deffenbacher] What studies— what studies have shown is that the probability of a misidentification increases. That's a general statement. Usually what's been shown is—in a particular study the probability of errors increase in a statistical significant sense, which means it is not just chance kind of increases. So we can't—in general we can't—it would be difficult to predict precisely just how much increase in error there might be.

One thing we do know, though, studies have shown, is the effects of photo bias are less likely to be a problem when the view-

ing circumstances are quite optimal. It's definitely more of a problem when the viewing circumstances are not so good. So we do know that. And so we know generally—we know about the direction of the effect and it's going to be more sizable in the case where the viewing circumstances weren't good, less sizable in a case where they are more reasonably optimal.

. . . .

Q. [State] Are you telling this Judge, then, that based on what you have reviewed, you are able to tell the Judge and the jury later a probability, a number probability that these witnesses have been affected by photo bias?

A. [Dr. Deffenbacher] I can't give a number. I can give an ordinal kind of judgment.

Q. Because what you are talking about, your ordinal type of judgment is just based on the studies that you have done before. There's no way you can give a probability or percentage chance that they could be correct based on this information, can you?

A. No, that's the job of the jury. But they need maybe the information to take into account because they are the ones that have to make that probabilistic judgment.

Based on Dr. Deffenbacher's own explanation, I do not find the evidence to be scientifically reliable under Tex.R.Crim. Evid. 702. The trial judge did not abuse his discretion in excluding the expert testimony, and point of error three should be overruled.[2]

---

**2.** I concur only with the majority's disposition of point of error one in finding the evidence to be

legally sufficient to sustain the conviction.