Jon David WEATHERRED, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–95–225 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Jan. 23, 2001.

Decided Jan. 24, 2001.

Daniel W. Hurley, Aaron R. Clements, Hurley, Sowder & Reyes, Lubbock, for appellant.

Michael A. McDougal, District Attorney, Jay Hileman, Gail Kikawa McConnell, Assistant District Attorneys, Conroe, for state.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION ON REMAND

WALKER, Chief Justice.

A jury convicted appellant of Capital Murder. The State was precluded from

seeking the death penalty in this trial.[1] Punishment was assessed at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. This cause has been remanded to us to consider the remainder of the appellate issues contained in appellant's brief. Although provided an opportunity to do so, neither party chose to file new or amended briefs with this Court. Therefore, the operative briefs before us reflect that they were both filed in the year 1996. We will now undertake to consider the remaining issues presented by appellant.

We are initially confronted with a complaint of factual insufficiency of the evidence to sustain the conviction based upon the holding contained in *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996). In a previous opinion, we considered a claim of the lack of legally sufficient evidence to sustain the conviction and rejected said claim. *See Weatherred,* 963 S.W.2d at 117–19. Since neither party chose to re-brief their positions on the appellate issues presented, we do not have the benefit of the parties' respective positions on what appears to be the most recent, and most significant, analysis of the law concerning appellate review of claims of factual insufficiency. *See Johnson v. State,* 23 S.W.3d 1 (Tex.Crim.App.2000). *Johnson* provides an extensive discussion as to what the Court considers to be a proper appellate review of factual sufficiency issues.

The *Johnson* Court noted that, in *Clewis,* it was unclear whether the Court had adopted both civil factual sufficiency review standards. *Johnson,* 23 S.W.3d at 10. The *Johnson* Court went on to hold that the appropriate scope of a *Clewis* criminal factual sufficiency review does, in fact, encompass both formulations utilized in civil jurisprudence, *viz:* that evidence can be

factually insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence. *Id.* at 11. The Court then explained how they intended to fit this peculiarly civil appellate review standard into the criminal context:

> Because the State always carries the burden of proof to establish the elements of a criminal offense at trial, an appellant's points of error challenging the sufficiency of the evidence used to establish the elements of the charged offense could claim that the evidence used to establish the adverse finding was so weak as to be factually insufficient. This is the most equitable approach, especially given the fact criminal defendants are not under any obligation to present evidence on their behalf and usually rely, instead, on forcing the State to prove its case beyond a reasonable doubt. Alternatively, in the event a defendant does muster contrary evidence, this standard of review allows him, if he so chooses, to present the argument on appeal that his evidence greatly outweighed the State's evidence to the extent that the contrary finding is clearly wrong and manifestly unjust. We hold, therefore, that our opinion in *Clewis* is to be read as adopting the complete civil factual sufficiency formulation.

*Id.* [footnote omitted] The *Johnson* Court then formulated a test, taken in part from Justice Vance's concurring opinion in *Mata v. State,* 939 S.W.2d 719, 729 (Tex.App.—Waco 1997, no pet.):

> [T]he complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks

1. The instant case was first tried in 1989 resulting in a guilty verdict and an assessment of life by the jury. This Court reversed the conviction and remanded the cause to the trial court for a new trial. *See Weatherred v. State,* 833 S.W.2d 341 (Tex.App.—Beaumont 1992, pet. ref'd). The subsequent history of

this cause was nothing if not extensive. We set it out chronologically: *Weatherred v. State,* 963 S.W.2d 115 (Tex.App.—Beaumont 1998), *vacated and remanded by,* 975 S.W.2d 323 (Tex.Crim.App.1998); *Weatherred v. State,* 985 S.W.2d 234 (Tex.App.—Beaumont 1999), *reversed by* 15 S.W.3d 540 (Tex.Crim.App.2000).

whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. Adoption of the complete standard allows us to remain true to one of the stated goals of *Clewis,* harmonization, when appropriate, of civil and criminal jurisprudence, and it recognizes the State's burden at a criminal trial is proof beyond a reasonable doubt.

*Id.*

■ In the instant case, the only thing we can say with some degree of certainty regarding the evidence placed before the jury is that there was absolutely no direct evidence that appellant was the person who pulled the trigger on the firearm that killed the victim on the morning of December 12, 1988. What we do have are two sets of various facts, one set presented to the jury by each of the respective parties. We are instructed by the Court of Criminal Appeals that we must conduct a "neutral" review of *all* the evidence, both for and against the finding of guilt. When this "neutral" review is accomplished, we then ask ourselves two questions: does the said "neutral" review of all of the evidence demonstrate that the proof of appellant's guilt is so "obviously weak" that it undermines our confidence in the jury's verdict, AND, is the proof of appellant's guilt, "although adequate if taken alone," "greatly outweighed" by contrary proof? If we answer either of these questions in the affirmative, the judgment must be reversed and the cause remanded for a new trial.

■ The case for the State and the case for the defense both provided compelling circumstantial evidence in hopes that said evidence would allow the jury to infer what its respective proponent intended. Indeed, all the jury had before it from which to base its verdict was inferences from the evidence. Taken by itself, each case presented by its respective party provided

sufficient reasonable inferences for the jury to have rendered the verdict the respective party was seeking. Yet, even under a "neutral" factual sufficiency review, certain directive phrases sharply curtail how far we are able to "disagree with the factfinder." As set out above, after our "neutral" review of all of the evidence, we are permitted to disagree with the factfinder only if all of said evidence demonstrates that appellant's guilt was so "OBVIOUSLY WEAK" as to undermine our confidence in the verdict rendered. In the instant case, the State's case for guilt was neither obviously weak, nor was it obviously strong, when examined in a neutral light against appellant's case for the defense. The factfinder therefore cannot be faulted for preferring the State's case over that of the defense. Nor can we say, in responding to the second factual sufficiency review question, that the State's case, although indeed adequate if taken alone as we have already mentioned, is "GREATLY OUTWEIGHED" by contrary proof, i.e., the case for the defense. Again, our extensive reading of the record indicates that neither party held any "trump cards." And because of this, as we appreciate the review standard set out in *Johnson,* appellant's case in his defense, although very strong at several points, simply did not "greatly outweigh" the evidence presented by the State in support of its theory that appellant committed the murder of the victim. We therefore overrule appellant's second issue finding the record contains, under the appellate standards announced in *Johnson,* factually sufficient evidence to support the conviction.

■ Appellate issue four complains of trial court error in overruling appellant's objection to the portion of the jury instructions that failed to properly limit the general definitions of culpable mental states to the primary and underlying offenses making up the instant capital murder charge. Contrary to the State's initial response, we find appellant's trial counsel adequately

preserved the issue for appellate review by his objection at trial.

The indictment in the instant case reads, in pertinent part, as follows:

[Appellant] . . . did then and there intentionally cause the death of an individual, William Ralph Strawn, by shooting him with a firearm, and said Defendant committed the murder of William Ralph Strawn in the course of committing or attempting to commit the offense of burglary of a habitation owned by Pamela Beene;

### COUNT II

[Appellant] . . . did then and there intentionally cause the death of an individual, William Ralph Strawn, by shooting him with a firearm, and said Defendant committed the murder of William Ralph Strawn in the course of committing or attempting to commit the offense of robbery of William Ralph Strawn;

[Appellant] . . . did then and there intentionally and knowingly use and exhibit a deadly weapon, to-wit: a firearm, during the commission of the aforesaid offense;
. . .

The clerk's record indicates that the trial court's instructions submitted to the jury did indeed include the full statutory definition of "intentionally." *See* TEX.PEN. CODE ANN. § 6.03(a) (Vernon 1994). As for the term "knowingly," the trial court provided the jury with the following definition:

A person acts knowingly, or with knowledge, with respect to the nature of his conduct when he is aware of the nature of his conduct. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*See* TEX.PEN.CODE ANN. § 6.03(b) (Vernon 1994).

Capital murder is a "result of conduct" offense; a jury charge which defines "intentionally" as it relates to the nature of conduct as well as the result of conduct is, therefore, incorrect. *See Cook v. State,* 884 S.W.2d 485, 491 (Tex.Crim. App.1994). Likewise, it would also be error to define a knowing murder as it relates to the nature of conduct instead of only defining it as the result of conduct. *See Medina v. State,* 7 S.W.3d 633, 639–40 (Tex.Crim.App.1999). In the instant case, the term "intentionally" was included in the substantive offense portions of the indictment ("Counts" I and II), as well as in the "deadly weapon" allegation. The term "knowingly" was used only in the "deadly weapon" allegation in the indictment.[2] In a capital murder case, not only is the State required to prove that the accused intentionally caused the death of the victim, a result of conduct crime, but the State must further prove that the accused engaged in other criminal conduct (i.e., kidnapping, robbery, burglary, aggravated sexual assault); or had knowledge of certain circumstances (i.e., that the victim was a peace officer). Therefore, while it is true that capital murder is a result of conduct offense, it is more accurate to view it as a result of conduct offense which also includes nature of conduct and/or nature of circumstances elements depending upon the aggravating offense or offenses which elevate the intentional murder to capital murder. *Hughes v. State,* 897 S.W.2d 285, 295 (Tex.Crim.App.1994).

In the instant case, as the aggravating offenses consisted of both robbery and burglary allegations, the instructions to the jury also contained the statutory definitions of both burglary of a habitation and robbery as well as the various definitions comprising the "component parts" of robbery and burglary. For example, following the statutory lan-

2. The term "knowingly" was used in the application paragraph of the lesser included offense instruction of Murder which was also submitted to the jury. As the jury convicted appellant of Capital Murder, we presume the jury did not consider the lesser included application paragraph.

guage defining burglary of a habitation, further statutory definitions of the terms, "enter," "building," "habitation," "theft," "appropriation and appropriate," "property," "deprive," "effective consent," "owner," and "possession" appear. Then, following the statutory definition of robbery, the following terms were further defined: "in the course of committing theft," "bodily injury," and "deadly weapon." These various "component parts" definitions have been found to encompass all three conduct elements. *See Patrick v. State,* 906 S.W.2d 481, 492 (Tex.Crim.App.1995). Therefore, because the offense of capital murder, as pleaded in the instant case, included all three of the conduct elements when also considering the "constituent definitions" of the aggravating offenses also pleaded, the trial court did not err in permitting the definitions of "intentionally" and "knowingly" to include the nature of conduct element. However, in permitting the nature of conduct element to remain in the definitions of "intentionally" and "knowingly," the trial court did err in failing to limit the conduct elements to the underlying offense of capital murder, which contained allegations of intentional murder, burglary of a habitation, and robbery. *Id.; Hughes,* 897 S.W.2d at 296 n. 16. Since appellant's trial counsel interposed a timely objection, we must now examine whether the error resulted in "some" rather than "egregious" harm to appellant. *Hughes,* 897 S.W.2d at 296; *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (opinion on rehearing). However, for both preserved and unpreserved charging error:

> [T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

*Patrick,* 906 S.W.2d at 492; *Almanza,* 686 S.W.2d at 171. Furthermore, in assessing the harm resulting from the failure to further limit the underlying offense to the respective conduct elements, we may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge. *Patrick,* 906 S.W.2d at 492; *Cook,* 884 S.W.2d at 492 n. 6.

▌ In the instant case, it is clear from the evidence that the actor intended to cause death to the victim. The victim was shot "execution style." It is also clear that, based upon the evidence, the perpetrator not only intended the result (death to the victim), but also had the conscious objective or desire to engage in the conduct that led to the victim's death. Therefore, failing to omit "nature of conduct" language with regard to the intentional murder offense does not demonstrate some harm to appellant in the instant case. His defense consisted almost entirely of presenting an alibi for his whereabouts on the day in question.

At any rate, the application portion of the trial court's instructions to the jury contained, in pertinent part, the following:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 12th day of December, 1988, in Montgomery County, Texas, the defendant, Jon David Weatherred, did then and there intentionally cause the death of William Ralph Strawn by shooting him with a firearm in the course of committing or attempting to commit the offense of (1) Burglary of a Habitation owned by Pamela Beene, as previously defined; and/or (2) Robbery of William Ralph Strawn, as previously defined, then you will find the defendant Guilty of Capital Murder, as charged in the indictment.

Like the application portion set-out in *Patrick,* in the instant case the application paragraph states that appellant "did ... intentionally cause the death of [the victim]." The term intentionally directly modifies the phrase "cause the death." Referring back to the definitions of culpa-

ble mental states, it is obvious that the "result of conduct" and "cause the result" language are the applicable portions of the full code definitions. *See Patrick,* 906 S.W.2d at 493. As did the *Patrick* Court, we too find that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the trial court's failure to limit the definitions of culpable mental states to the respective offenses contained in the capital murder allegation. *Id.* Appellate issue four is overruled.

■ Issue five complains of error by the trial court in permitting, over objection, the testimony of witnesses N.R. and B.M. because of the impermissibly suggestive procedure by the authorities in conducting the photo line-up identification of appellant. The record before us reflects that the trial court conducted a hearing out of the jury's presence on the issue of admissibility of the identification testimony of N.R. and B.M. At the conclusion of the hearing, the trial court ruled that both of the witnesses could testify as to identification, denying appellant's motion to suppress. The trial court made no findings of fact or conclusions of law with regard to his ruling. We must review the trial court's ruling in the light of what was before the court at the time the ruling was made. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000). Therefore, our review of the relevant evidence is confined solely to that elicited during the suppression hearing.

In the instant case, testimony at said hearing indicated that N.R. was eighteen years old at the time of trial, twelve years old at the time the offense was committed. On the day of the offense, she was living with her parents in a house across the street from the residence in which the murder took place. At approximately 7:55 a.m. on the day of the murder, N.R. went out to her front porch to see if her school bus had already passed. In doing this, she glanced over at the Beene residence, the scene of the murder, and noticed Ms. Beene's garage door open, a car inside, and a man crouched down on the driver's side of the vehicle near the front tire. N.R. looked again for the bus, saw it, and again glanced back into the garage for a matter of seconds. She noticed that the man, who was facing mostly away from N.R.'s vantage point, was wearing a "jacket with a fuzzy collar." Said jacket appeared to match a jacket later recovered from appellant's home by the authorities. N.R. was only able to see the man's cheek and neck area, the back of his head, his hair and his back, but "not any bit of his face." N.R. described the man's hair color as "blondish" and "growing in the back," and his skin color as "definitely red like sunburned color."

Following the discovery that N.R. was a potential witness, the authorities went to her home on several occasions to show her photographs. On the first occasion, N.R. was shown a photograph with a group of individuals looking like they were dressed for hunting. Appellant was one of the people depicted in said photograph. On another occasion, the authorities came to N.R.'s residence and showed her a photographic display consisting of six small photographs of different males apparently taken at book-in proceedings at the local jail. Appellant's photograph was also present in this display. Both times N.R. was shown photographs, she "picked out someone, but [she] was saying it according to he look[ed] the most like it." In essence, N.R. chose the person most similar to the man she remembered seeing in the Beene garage, but she could not be positive that the person chosen was the same person she had seen in the garage. Finally, N.R. was taken to view a live line-up with appellant again being present. After viewing appellant in person and having him engage in some crouching movements and positions, she again picked appellant because "he looked the most—he looked very similar. Not 100 percent, but from the view, you know, he was exactly the same." At trial,

N.R. was asked if appellant looked like the man she had seen in the Beene garage. N.R. replied that he did look like the man, and she based this on appellant's skin color, hair, hair color and body. Nevertheless, N.R. maintained that she could not positively identify appellant as the man in the Beene garage on the day of the murder because she never saw the man's face.

Witness B.M. was much more positive in her identification of appellant. As with N.R., B.M. was shown a series of photographs in which appellant was the only individual who appeared in all. At about 7:15 a.m. on the day of the murder, B.M. was seeing her husband off to work. As she did this, B.M. observed, through a garage door window, a man walking up her driveway. B.M. did see the man's face and made a positive identification of appellant as the same man. B.M. further stated that the man began walking up her driveway but when her husband engaged the automatic garage door opener, the man proceeded walking back across the driveway and onto the street. B.M. then described the series of photo displays conducted by the authorities culminating in the live line-up at which she again picked out appellant as the man she had seen walking up her driveway on December 12, 1988. When initially questioned by the authorities, B.M. gave them the following description of the man she saw the morning of the murder: "I would say he was probably about five-nine, light brown jacket, gray pants, probably about 28 years old with strawberry-colored hair with one of those spiked haircuts that they were wearing at that time." B.M. further testified that she was shown the "hunters" photograph about two to three weeks after the day of the murder, and then was shown the photographic display about two to three weeks after viewing the "hunters" photograph. And the time she viewed the live line-up was sometime in March of 1989. Finally, B.M. approximated the total viewing time of the man walking up her driveway to be "ten seconds."

We initially discuss the propriety of witness B.M.'s in-court identification of appellant. As we appreciate the rather extensive law on the issue, regardless of the suggestiveness of the out-of-court identification procedures conducted by the authorities, if a witness has the ability to make an in-court identification that has an origin independent of any improper out-of-court identification process, then said in-court identification testimony is admissible. *McFarland v. State,* 928 S.W.2d 482, 507 (Tex.Crim.App.1996). In the instant case, witness B.M. emphatically testified that she saw the face of the person walking up her driveway on the morning of the murder. We reproduce salient portions of her testimony:

Q. [State's Attorney] And which direction would that have been that he [the man in her driveway] turned?

A. [B.M.] To my left as I was facing him.

Q. Did you get a chance to see the man's face?

A. Yes.

Q. Do you see that man here in the courtroom?

A. Yes.

Q. For the Judge, please point him out and for the record say what he is wearing.

A. Sport coat, black pants and black and gray tie.

[State's Attorney]: Your Honor, let the record reflect she's identified the Defendant, Jon David Weatherred.

THE COURT: Record may so reflect.

. . . .

Q. [Defense Counsel]: Do you recall telling the officers that night that you did not remember seeing the face of this person?

A. [B.M.] I saw the face.

[State's Attorney]: Judge, I am going to object to this line—

THE WITNESS: I don't understand.

[State's Attorney]: I'm going to object to this as not being relevant to any suggestiveness or taintedness of any of her pretrial identification or in trial identification.

THE COURT: Sounds like we're going into things that more appropriately would be gone into before the jury.

[Defense Counsel]: Your Honor, it is relevant to whether or not she had a memory of the face before seeing any photographs.

THE WITNESS: I did.

In the instant case, we find that witness B.M. clearly indicated that her in-court identification of appellant as the man she saw walking up her driveway the morning of the murder had its origins independent of any improper out-of-court identification process. We now turn to an analysis of this issue with regard to witness N.R.

 It is undisputed by both parties that N.R. never *positively* identified appellant during the suppression hearing or during testimony before the jury. The essence of her testimony was that the person she observed in the garage on the day of the murder had certain physical characteristics and was wearing a jacket with a "fuzzy collar." Thereafter, N.R. was subjected to identification procedures by the authorities similar to those used with witness B.M. Regardless of the suggestive nature of the photo reviewing procedures used with N.R., she maintained that she could not positively say that the man in the garage was the appellant because she never saw the man's face. Because of the lack of a *positive* identification by N.R., her testimony can be characterized as circumstantial evidence of the possibility of appellant's presence at the scene of the murder only moments before or after the murder took place. At most, N.R.'s testimony in-

dicated that appellant's physical characteristics very closely resembled those of the man she observed in the garage. The identity of a perpetrator may be proved by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex.Crim.App. 1986); *Dimas v. State*, 14 S.W.3d 453, 458 (Tex.App.—Beaumont 2000, no pet.). Although N.R.'s testimony was not direct evidence of appellant's presence near the scene of the murder on the morning it occurred, as was the case with B.M.'s testimony, nevertheless, N.R.'s testimony was another link in the State's chain of seemingly incriminating circumstances that it hoped would add up to a guilty verdict from the jury.

 As has been noted in a number of cases, the fact that a witness was not able to view the facial features of a suspect at the time of the offense and could give the authorities only a general description of the suspect, such matters go to the weight and not the admissibility of the witness's testimony. *See Livingston v. State*, 739 S.W.2d 311, 334 (Tex.Crim.App.1987); *Garza v. State*, 633 S.W.2d 508, 513 (Tex. Crim.App.1981) (opinion on rehearing); *Johnson v. State*, 510 S.W.2d 944, 948 (Tex.Crim.App.1974). In the instant case, the jury had before it all the relevant [3] information concerning N.R.'s observations on the day of the murder as well as the subsequent identification procedures used by the authorities. It was the jury's duty to determine N.R.'s credibility and decide what weight, if any, to give to her testimony. *Garza*, 633 S.W.2d at 514. Additionally, as noted in *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155 (1977):

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of

3. With regard to witness N.R., since she never positively identified appellant as the man she observed in the garage, we wonder what relevance any evidence of the various identification procedures, including State's Exhibits 153 and 154, had. Since both exhibits only depicted individuals in full-frontal facial views, and N.R. expressly stated she did not see the man's face, we wonder what the exhibits were suppose to have "suggested" to N.R. in the first place.

untrustworthiness is customary grist for the jury's mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

We therefore find no error by the trial court in denying appellant's motion to suppress the testimony of either B.M. or N.R. Issue five is overruled.

Appellant's final issue complains that the trial court erred in denying his motions for mistrial when it was discovered that individual jurors had been informed by outside sources that a previous trial had taken place or had been threatened so as to ensure appellant's conviction. Appellant's brief cites us to instances involving three separate jurors with each instance being unique and apparently unrelated. In each instance, the juror was made aware of the outside information during the course of the trial and not after deliberations had begun. Therefore, appellant's initial reliance on what is now Tex.R.App.P. 21.3(f), which provides, "The defendant must be granted a new trial for any of the following reasons: when, after retiring to deliberate, the jury has received other evidence; [or] when a juror has talked with anyone about the case[,]" is entirely misplaced because, as noted, the jury had not yet retired to deliberate.

Nevertheless, it is axiomatic that for an accused to have a fair trial, the jury must decide his case on the basis of the evidence presented at trial. Therefore, when jurors converse with unauthorized persons about a case, injury to the accused is presumed and a mistrial may be warranted. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex.Crim.App.1991); Tex.Code Crim.Proc.Ann. art. 36.22 (Vernon 1981) ("No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.") The State, however, may rebut the presumption of harm. *Robinson*, 851 S.W.2d at 230. The record before us reflects that with each of the jurors involved, the trial court conducted a hearing out of the presence, and without the knowledge, of the other jurors. In each instance, the information conveyed to the juror was clearly prejudicial to appellant in that it informed the juror of either a previous trial involving appellant or that appellant had been previously convicted of the same offense. However, each juror testified that he/she did not tell any other jurors about the outside information and that the nature of the outside information would not influence him/her in reaching a verdict on guilt or innocence. As was the circumstance in *Robinson*, the trial judge in the instant case was in a position to observe each juror's testimony, and he apparently chose to believe that none of them was influenced or prejudiced against appellant by the nature of the outside information. On this record, we cannot say the trial court abused its discretion in denying appellant's motions for mistrial. Issue six is overruled. The judgment and the sentence of the trial court are affirmed.

AFFIRMED.